**LEWISTON, GREENE AND MONMOUTH TELEPHONE COMPANY et al., Complainant,**

v.

**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, Respondent.**

**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, Plaintiff,**

v.

**LEWISTON, GREENE AND MONMOUTH TELEPHONE COMPANY et al., Defendants.**

Supreme Judicial Court of Maine.

Jan. 26, 1973.

Pierce, Atwood, Scribner, Allen & Mc-Kusick, by Vincent L. McKusick, and Pe-

ter L. Murray, Portland, for New England Telephone and Telegraph Co.

Horace S. Libby, Augusta, for Public Utilities Comm.

Frank E. Southard, Jr., of McLean, Southard & Hunt, Augusta, with whom appeared Harold D. Carroll, of Waterhouse, Carroll & Cyr, Biddeford, Frank W. Linnell, of Linnell, Choate & Webber, Auburn, for Lewiston, Greene & Monmouth Telephone Co., and others, complainants and defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

In June of 1970, the Lewiston, Greene and Monmouth Telephone Company filed with the Public Utilities Commission a complaint, pursuant to 35 M.R.S.A. § 251,[1] against the New England Telephone and Telegraph Company (New England). Alleging that the existing arrangement between it and New England for so-called "Extended Area Service" (EAS) and "Extended Local Service" (ELS)[2] settlements

[1]. This statute provides in part: "If . . . telephone or telegraph companies do not agree upon the division between them of the cost of . . . physical connection or connections or the division of the joint rates, tolls or charges established by the commission over . . . through lines, the commission shall have authority, after . . . hearing, to establish such division by . . . order."

[2]. The Commission has revealed that it considers these different designations to refer to a single underlying service by which, as instituted by one or more telephone companies, "the local (non-toll charge) calling area of an exchange is enlarged by expanding the local (non-toll charge) calling area by combining it with one or more additional exchanges in order to eliminate the toll charges on individual messages."
   According to the Commission, the Independents in their tariffs refer to this service as "Extended Area Service (EAS)", but recently New England changed its tariff references to the service to label it "Extended Local Service (ELS)." Viewing the underlying service to be the same notwithstanding the duality of appellations, the Commission employed the single symbol, "EAS/ELS." The Court will use the same designation throughout this opinion.
   EAS/ELS is provided in the State of Maine in three different contexts: (1) by New England between two or more of its own exchanges (e. g., toll free calls between New England's "Portland" and "Windham" exchanges) and which (because New England is an operating part of the Bell system) is generally designated "B-B EAS/ELS"; (2) by a given Independent (non-Bell) Telephone Company between its own exchanges (e. g., toll free calls between Lewiston, Greene and Monmouth's "Winthrop" and "Greene" exchanges) so-called "I-I EAS/ELS" and

was unfair and unreasonable, the complaint asked the Commission to establish a more equitable settlement arrangement.

The Commission regarded the complaint as precipitating the generalized question:

"What are the proper procedures and methods for determining EAS/ELS settlements between the telephone companies in the State of Maine rendering this type of interexchange (between exchanges) service to the telephone-using public in Maine?"

In the exercise of discretionary and investigatory powers reposing in it, the Commission ordered the proceeding broadened to include as parties all telephone companies which provide intrastate telephone service in the State of Maine.

Extensive hearings were held. On May 24, 1972 the Commission issued a "Decree and Order" embodying various findings of fact and conclusions.

On June 22, 1972, purportedly pursuant to 35 M.R.S.A. § 303,[3] (hereinafter "Section 303") New England filed a notice of "appeal" and thereafter took all appropriate steps to complete the record on appeal and to have the appeal docketed in the Law Court.

Lewiston, Greene and Monmouth Telephone Company and all of the other independent telephone companies whom the Commission had made parties to the proceeding have filed a motion to dismiss this appeal of New England on the ground that the appeal is "premature" in that the Commission had not yet made a "final decision"

within the meaning of Section 303. The Commission has joined in the motion.

Two other motions are before us for decision. They arise because New England, in addition to its Section 303 "appeal" and likewise in June of 1972, filed a "complaint" in the Law Court to invoke the jurisdiction conferred by 35 M.R.S.A. § 305 (hereinafter "Section 305").[4]

The Independent Telephone Companies (the Public Utilities Commission joining with them) have filed a motion to dismiss this Section 305 "complaint." They rely on two grounds (1) "prematurity" and (2) "a waiver of the right of New England . . . to proceed under . . . § 305 because of New England's having concurrently taken a . . . § 303 appeal."

The second motion concerning New England's Section 305 "complaint" proceeding is a motion by New England, as the complainant asking the Law Court to order the taking of additional evidence. This motion was filed on September 6, 1972 and claims to be pursuant to the provisions of Section 305:

" . . . that in cases where issues of confiscation or of constitutional right are involved the court may order such additional evidence as it deems necessary for the determination of such issues to be taken before the commission upon such terms and conditions as to the court may seem proper."

New England's motion specifies that its Section 305 "complaint" raises issues of "confiscation" and "of constitutional right." The motion further calls special

---

(3) by New England and an Independent, acting together (e. g., toll free calls between New England's "Augusta" and Lewiston, Greene and Monmouth's "Winthrop" exchange) so-called "B-I EAS/ELS."

3. 35 M.R.S.A. Section 303 states: "An appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action."

4. Section 305 provides: "Notwithstanding section(s) 303 . . ., in all cases in which the justness or reasonableness of a rate, toll or charge by any public utility or the constitutionality of any ruling or order of the commission is in issue, the law court shall have jurisdiction upon a complaint to review, modify, amend or annul any ruling or order of the commission, . . . to the extent of the unlawfulness of such ruling or order."

attention to alleged facts that (1) the Commission's Decree and Order of May 24, 1972 was forthcoming more than a year after the evidentiary record before the Commission had been closed (on May 4, 1971); (2) more than fifteen months had elapsed between the close of evidence and the motion for additional evidence (September 6, 1972); and (3)

"substantial changes have occurred in facts relevant to the issues of confiscation and constitutional right . . . involved . . .."

For reasons assigned hereinafter, we decide the two motions pertaining to the Section 305 "complaint" proceeding by (1) denying the Independents' (and Commission's) motion to dismiss the proceeding and (2) granting, with limitations, New England's motion for additional evidence.

It is our further conclusion, as hereinafter more fully discussed, that our disposition of the motions concerning the Section 305 proceeding renders presently unnecessary a decision upon the third motion before us—that of the Independents (and the Commission) to dismiss the "appeal" taken by New England under Section 303; and, accordingly, we retain this motion upon our docket, as continued without decision, to await future developments.

I

Adequate comprehension of the problems presently involved requires extensive description of particular facets of the Commission's Order of May 24, 1972.

First, the Commission found fundamental deficiencies in the existing "interim" settlement agreement, known as the Originating Responsibility Plan (ORP) and which New England sought to have the Commission approve,—as follows: (1) as to the Independents, their

"average cost per minute of use (on a fully allocated cost basis) is substantially higher than the New England['s] . . . average cost per minute of use"

and (2) ORP is "unreasonable" because it fails to result in the Independents' recovering in the form of settlements these average relatively higher fully allocated costs as the Independents' contribution to EAS/ELS operations in this State.[5]

Second, the Commission conceived the key to any reasonable and equitable settlement arrangement to lie in acceptance of the principle that all telephone customers in the State of Maine must be afforded a reasonable, relatively equal, and equitable opportunity to participate in "non-toll" services "between" exchanges; and, therefore, the settlement question on these "non-toll" services "between" exchanges must be resolved in a manner that will not unduly burden any segment of the present or prospective "non-toll between exchanges" customer body in Maine. On this basis, "significant" as an "element" in the proper resolution of the issue, in the view of the Commission, is:

"recognition of the Independents' [as compared to the Bell System's] relatively higher costs incurred per minute of use of plant and facilities, allocated or as-

---

5. ORP, as the Commission viewed it, is based on the principle that "each company pays the fully allocated cost of originating and carrying to the point of termination the EAS/ELS calls its customers initiate for the time duration of the EAS/ELS telephone connection established."

The Commission further criticized ORP as "fallacious" in principle because "the purpose of holding the telephone communication is to permit a two-way communications path" and, therefore, "once

a telephone connection is established, it is absolutely immaterial . . . which party to the connection initiated the attempt to establish the connection."

The Commission specified: "as a matter of fact, that there is a mutual benefit to each party to the ELS/EAS telephone connection, and that the benefit or value does not solely and exclusively accrue to the party . . . originat[ing] or attempt[ing] to establish the connection."

signed to the 'between' exchanges 'non-toll' services."

Third, the Commission evaluated the plan sponsored for Commission approval by the Independents, known as the "Stolz-O'Donnell", or "USITA", Plan. The Commission summarized it as follows:

". . . the USITA Plan envisions development of EAS/ELS revenue requirements by allocating or assigning the plant investment and associated expenses of all toll services, both intrastate and interstate, consistent with existing toll settlement procedures. The remaining investment and expenses would be associated with combined (a) intraexchange local service, and (b) the interexchange EAS/ELS service. Plant used exclusively for interexchange EAS/ELS, or for intraexchange service would be directly assigned. Plant used jointly for EAS/ELS and intraexchange local service would be apportioned to each service on the basis of relative use. A composite rate curve would then be developed for each class and grade of service reflecting the scope of the local (non-toll) calling area. EAS/ELS revenues would be derived from the composite rate curves by reading and determining the difference on the curve points of the exchange involved, both excluding and including EAS/ELS."

Fourth, as to the advisability of adopting the USITA Plan, the Commission concluded that "while the concepts underlying . . . [it] may have merit", the "data to support the application of the Plan to . . . [the Commission's] satisfaction" had not been adequately provided. As the Commission saw the evidence, "many questions were left open . . ." including (a)

"would the composite rate curves such as those proposed by the USITA Plan be frozen from the time of installation of EAS, or would the readings on the curves change as growth occurred in each of the exchanges"

and (b) if so,

"how often would the readings be taken on the curve?"

Fifth, having rejected the acceptability of both the settlement plan ORP favored by New England and the plan USITA advocated by the Independents, the Commission concluded that "the public interest reasonably requires" that the status quo (i. e., the continuing effectiveness of ORP) be changed.

In particular, the Commission believed that the public interest demanded cessation of New England's opportunity, in effect, to force the continuance of ORP, despite the Commission's conclusion of its inequities, by a resort to the expedient that New England

"on the one hand, . . . refrain[s] from developing and filing a uniformly applicable 'between' exchanges 'non-toll' tariff containing rates and charges for . . . 'non-toll' services applicable to its Bell customers and in which the Independents can concur and make the same rates and charges applicable to . . . customers [of Independent Companies]; and on the other hand, take[s] the position that either (a) the present composite 'local service' rates cannot be divided to obtain the EAS/ELS portion of such rate for revenue contribution and settlement purposes, or (b) that the methods of division proposed are unsound without recommending a method of division Bell considers sound."

Such technique the Commission characterized as New England's

"effectively block[ing] reasonably comparable treatment of Bell and Independent Company customers in this State desiring to receive or receiving 'between' exchanges 'non-toll' services."

Sixth, to break this continuing obstruction to the adoption of any new EAS/ELS settlement plan, the Commission promulgated, in the public interest, a settlement

plan of its own, to be operative on an interim basis and designated by the Commission as the "Interim Maine EAS/ELS Settlement Plan."

According to the Commission; (1) it is clearly not just or reasonable

"that the New England Telephone Company, serving approximately 90% of the telephones in the State of Maine . . . because of its dominant position should be permitted to continue to exclude the subscribers of the Independent telephone companies to their economic detriment, constituting only 10% of the telephones in this State, from receiving on a comparable basis 'between' exchanges 'non-toll' services any more than . . . it would be just or reasonable to treat the customers of the Independents, constituting 10% of the telephones in this State, differently with respect to 'between' exchanges 'toll' service;"

and (2) hence, the "Interim Maine Plan" of the Commission represents an attempt to achieve a solution based on the fundamental principle

"establishing equity among and between telephone customers in the State of Maine."

The full significance of this principle, in the Commission's view, is that "telephone companies, although different corporate entities", are subject to the responsibility of providing "an integrated telecommunications system to telephone customers within this State"; and, therefore, they have a

"responsibility of equitable and non-discriminatory treatment of telephone customers [which] extends not only to the customers of one corporate entity, but to customers of all telecommunications of corporate entities within the State of Maine, to the end that customers substantially similarly situated should receive comparable and substantially similar treatment in measuring the degree of the relative burden the various classes of customers might reasonably be expected

to assume by the way of paying rates and charges for 'between' exchanges services, whether it is classified as 'toll' or 'non-toll'."

Seventh, having thus delineated the philosophy and controlling general principles of its "Interim Maine Plan", the Commission made findings that (1) settlements by New England (Bell) to the Independents shall recognize

"the Independents' relative contribution of . . . investment in plant and associated expenses, allocated or assigned to EAS or ELS operations in the State of Maine"

and (2)

"the contribution of the Independents by way of investment and expenses in exchange plant, allocated or assigned to ELS/EAS operations in the State of Maine, is $.022 per minute of originating EAS/ELS minute of use, and $.022 per terminating EAS/ELS minute of use"

as compared with $.009 in each of the foregoing categories for New England (Bell).

Using these figures as a foundation, the Commission then presented, in detail, formulas and calculating methodology by which data essential to the determination of equitable settlement amounts should be developed.

Eighth, the Commission ordered that action be taken by New England, in conjunction with the Independents, as follows: (1) by following the specifications of the findings (above summarized), they "develop in the most expeditious, mutually acceptable manner" the informational data— this to be done prior to the expiration of ninety (90) days, in order that (2) "within ninety (90) days they furnish to . . . [the] Commission . . . an estimate of settlement amounts that will result from the use of [the] data developed . . . ." this to be embodied in a schedule showing, in addition, "monthly EAS/ELS settlement

amounts presently being received under existing EAS/ELS settlement agreements."

Ninth, and finally, the Commission announced that after the completion of the aforesaid action by New England and the Independents, the Commission, to avoid "sudden economic impact on any company" and "to bring about a smooth transition from present procedures", would by further supplemental decree "set the effective date or dates when . . . [any] payments in whole or in part shall commence." [6]

## II–A

### The Motion To Dismiss the Section 305 "Complaint" Proceeding

We consider initially the motion (of the Independents and the Commission) to dismiss New England's Section 305 "complaint" proceeding.

### II–A–(1)

■ As to the first of the two grounds underlying this motion—that the Section 305 "complaint" proceeding is "premature", —we note, at the outset, that the literal language of Section 305 reposes jurisdiction in the Law Court in relation to *"any* ruling or order of the commission" (emphasis supplied) the "constitutionality" of which is, as here, "in issue."

In this respect, the language of Section 305 is, on its face, immediately and directly in contrast with the wording of Section 303 by which the "appeal" jurisdiction of the Law Court "on questions of law" is restricted to *"a final decision* of the commission" (emphasis supplied), and as to which the statute explicitly analogizes the juris-

diction of the Law Court to that conferred in

"an appeal from a judgment of the Superior Court in a civil action."

This explicit language differentiation suggests, prima facie, that the Legislature intended the Section 305 remedy by "complaint" to be available notwithstanding that a Commission "ruling or order", attacked for *constitutional* infirmity, might not have attained "finality"—in the sense signified by that concept (in contradistinction to "interlocutoriness") as it is utilized to prescribe when an "appeal" will lie from a Superior Court "judgment" entered in a "civil action."

The prima facie indication is confirmed by historical developments reasonably cognizable as factors contributing to the enactment of Section 305.

Persons whose rights were being affected in particular respects in proceedings before administrative agencies had always been afforded opportunity to invoke collateral judicial interposition. Most often, such collateral judicial intervention was accomplished through resort to principles of equity jurisdiction (although at times other appropriate judicial power, applicable in the premises, might be asserted); and it was predicated on the basis that "errors of law" of a special nature rendering the administrative action "invalid"—as constituted by lack, or excess, of "jurisdiction", or by *unconstitutionality* (including arbitrariness, confiscation or other violation of constitutional rights and guarantees)—had occurred. Spoffard, Pet'r. v. Bucksport & Bangor Railroad Company, 66 Me. 26 (1876); New York ex rel. Consolidated Water Co. v. Maltbie, 303 U.S. 158, 58 S. Ct. 506, 82 L.Ed. 724 (1938). See: Hamilton v. Caribou Water, Light & Power

6. On August 21, 1972 the Commission ordered that the 90 day period be stayed "for a period of seven (7) days from the date of August 24, 1972, or until further order of this Commission." On September 25, 1972 the Commission extended the time for the furnishing of the data until November 27, 1972 and prescribed additional methodology for development of the estimates specifically in relation to the determination of "originating and terminating EAS/ELS minutes of use."

Company, 121 Me. 422, 426, 117 A. 582 (1922); S. D. Warren Company v. Maine Central Railroad Company, 126 Me. 23, 25, 135 A. 526 (1926); Casco Castle Company Pet'r., 141 Me. 222, 225, 42 A.2d 43 (1945).[7]

Such collateral judicial intervention into the proceedings of administrative bodies could occur even though the administrative processes had not been fully completed or the status of the proceedings, at the time of the collateral judicial attack, might have been regarded as "interlocutory" rather than "final" (as measured by the "finality" standard operative to delineate when, within the internal structure of the judicial system itself, a higher Court would review a lower Court's "judgment"). Leedom et al. v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L. Ed.2d 210 (1958); Western Pennsylvania Hospital v. Lichliter, 340 Pa. 382, 17 A.2d 206 (1941); Howard Co. Jewelers v. New Jersey State Board of Optometrists, 133 N.J.Eq. 4, 29 A.2d 742 (1943). See: Shields v. Utah Idaho Central Railroad Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111 (1938).

Correlatively, however, the complexities of life during, and subsequently to, the fourth decade of the twentieth century were indicating a need that larger and more unhampered range be afforded the administrative process, and a tendency set in toward constriction of the availability and scope of collateral judicial interposition into the ordinary course of administrative proceedings. Illustrative of this public policy is the decision in Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) narrowing the exercise of the equity jurisdiction of the federal District Courts in relation to State administrative tribunals.

A particularized aspect of such policy to limit collateral judicial intervention in the administrative process is reflected in Maine, specifically in relation to the Maine Public Utilities Commission, by the case of Stoddard v. Public Utilities Commission, 137 Me. 320, 19 A.2d 427 (1941).

As an actual decision confined to its strict facts *Stoddard*, supra, really signified nothing new in principle. It (1) reaffirmed the traditional doctrine that when the Public Utilities Commission

"exceeds its authority it acts without jurisdiction and its orders are of no effect and are subject to collateral attack" (p. 323, 19 A.2d p. 428)

on the basis of the usual principles governing equity jurisdiction; and (2) decided on the special facts involved that conventional equity jurisdiction was lacking because the remedy provided at law (i. e., the remedy of "appeal" under then R.S.1930, Chapter 62, Section 63, now 35 M.R.S.A. § 303) was entirely adequate for decision of the *non-constitutional* issue being raised.[8]

7. Indeed, it had been held that there was even equity power reposing in the federal District Courts (if there existed diversity of citizenship or "federal question" jurisdiction) to have the actions of an administrative body of a State subjected to judicial scrutiny when the administrative action was claimed "invalid" for jurisdictional or constitutional infirmity. See: Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 344, 345, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Smyth v. Ames, 169 U.S. 466, 516, 18 S.Ct. 418, 42 L.Ed. 819 (1898); Willcox v. Consolidated Gas Company, 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909); Bacon v. Rutland Railroad Co., 232 U.S. 134, 137, 34 S.Ct. 283, 58 L.Ed. 538 (1914); Detroit and Mackinac Railway Company v. Michigan Railroad Commission, 235 U.S. 402, 35 S.Ct. 126, 59 L.Ed. 288 (1914); Oklahoma Natural Gas Company v. Russell, 261 U.S. 290, 293, 43 S.Ct. 353, 67 L.Ed. 659 (1923); Prendergast v. New York Telephone Co., 262 U.S. 43, 47, 43 S.Ct. 466, 67 L.Ed. 853 (1923); Pacific Telephone & Telegraph Company v. Kuykendall, 265 U.S. 196, 201, 44 S.Ct. 553, 68 L.Ed. 975 (1924); Railroad and Warehouse Commission of Minnesota v. Duluth Street Railway Company, 273 U.S. 625, 628, 47 S.Ct. 489, 71 L.Ed. 807 (1927).

8. In *Stoddard* the order was manifestly *"final"*, even as tested by the "interlocutory-final" criterion to define a "judgment" *as ready for direct review by*

Notwithstanding the unquestionable correctness of the actual decision in *Stoddard,* the case precipitated a problem because of the presence in the opinion of general language suggesting a broad principle that the special "appeal" provided by statute for the review of Public Utilities Commission decisions was legislatively intended as the "exclusive" method of judicial scrutiny of Public Utilities Commission action. By this language in *Stoddard* a likelihood was projected that *Stoddard* could be interpreted to have eliminated collateral judicial intervention, through the exercise of equity proceedings, even in the multitudes of situations in which the "appeal" remedy is really inadequate either because: (1) the statutory "appeal" being available only from a "final" (rather than "interlocuto-

ry") order, the appeal might not lie, in many instances, to permit review of invalid or unconstitutional administrative action not yet "final" until a time too late to avoid imminently irreparable injury or (2) even if the administrative order be "final", the scope of the "appeal" had become defined, O'Donnell, Pet'r., 147 Me. 259, 86 A.2d 389 (1952) and earlier cases cited therein, to exclude the constitutionally required independent judicial judgment on the facts (as well as the law) material to the adjudication of *constitutional* issues.[9]

■ In light of the foregoing background, we find it reasonable to attribute as a primary purpose of the Maine statute, as first enacted in 1953 and amended in 1961 [10] and all as now embodied in Section

"appeal", and was, therefore, plainly subject to the "appeal" remedy conferred by then R.S.1930, Chapter 62, Section 63 (now 35 M.R.S.A. § 303). Further, since the issue raised concerned only the *statutory "jurisdiction"* of the Commission— as involved in an interpretation of the "grandfather" clause of the State statute subjecting contract carriers engaged in the trucking business to Public Utilities Commission regulation and control, no *constitutional* issue was presented as to which—pursuant to the doctrine deriving from cases such as Ohio Valley Water Company v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908 (1920) ; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ; and St. Joseph Stock Yards Company v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936)—argument might be made to justify collateral judicial scrutiny jurisdiction (Cf. New York ex rel. Consolidated Water Co. v. Maltbie, 303 U.S. 158, 58 S.Ct. 506, 82 L.Ed. 724 (1938)) in that (1) it is constitutionally requisite that there be an independent judgment of a Court upon *the facts* (as well as the law) incident to that part of the (general) unlawfulness created by alleged *unconstitutionality* of administraitve action, and (2), hence, the remedy by "appeal", as operative to review issues of law without independent judicial judgment as to *the facts* material to the disposition of *constitutional* issues, would be constitutionally inadequate.

9. Were *Stoddard* to be taken as importing such total exclusion of collateral ju-

dicial authority to intervene in the administrative processes, especially through resort to traditional equity powers and principles, *Stoddard* would project a serious constitutional problem insofar as the scope of the "appeal" remedy precludes opportunity for an independent judicial judgment on the facts material to constitutional deficiencies and, hence, the State's action in purporting to make it exclusive could be a denial of a constitutionally required independent judicial evaluation and judgment of facts essential to the appropriate determination of constitutional issues, whether of confiscation of property or otherwise. See: Opinion of the Justices, 328 Mass. 679, 106 N.E.2d 259 (1952). Cf. New York ex rel. Consolidated Company v. Maltbie, 303 U.S. 158, 58 S.Ct. 506, 82 L.Ed. 724 (1938).

10. In 1953 the statute was worded to make plain that the jurisdiction sounded in *equity*, as invoked procedurally by an original petition in equity initiated in the Law Court. P.L.1953, Chapter 377, Section 3. The modification effected in 1961 by which under P.L.1961, Chapter 317, Section 94, the language "petition in equity" was supplanted by "complaint" was a procedural alteration calculated to establish only a procedural uniformity with the Rules of Civil Procedure which had become effective December 1, 1960. This procedural change must not be allowed to obscure the critical point that the substantive scope of the jurisdiction conferred upon the Law Court was governed by the principles of equity.

305, a definitive relationship to the authorization of collateral judicial scrutiny, through the exercise of equity jurisdiction, of the administrative processes of the Public Utilities Commission.

Regardless of whether the language "justness or reasonableness" concerning "rates, tolls or charges" might be thought to extend beyond the *constitutional* concept connoted by the word "confiscation",—and thus might include errors other than those of constitutional dimension which might produce "unjustness or unreasonableness" in any rate, toll or charge of a public utility, (an issue which we need not presently decide),[11]—it is undisputed that under Section 305 *all constitutional* issues precipitated by "*any* ruling or order of the commission" (emphasis supplied) are placed within a jurisdiction, sounding in equity, conferred upon the Law Court. Further, it is likewise beyond question that such Law Court jurisdiction exists under Section 305, "notwithstanding" the availability of the remedy by "appeal" for "errors of law" as provided in Section 303.

■ Such plain provisions of Section 305, in view of the historical antecedents, reveal, as the reasonable import of the statute, a legislative reaffirmation in the specific context of the Public Utilities Commission of a *continuing* availability of the *equity jurisdiction* which was operative traditionally, (1) if an administrative ruling, or order, was claimed *unconstitutional* and, therefore, invalid—the remedy at law being inadequate, as it is under the Section 303 "appeal" because it fails to allow independent judicial judgment as to the "constitutional" facts O'Donnell, Pet'r., supra, (irreparable damage being generally imputed) ; and (2) which could be invoked before the administrative process might have arrived at a terminal point identifiable as "final" (rather than "interlocutory") as measured by the purposes generally contemplated for the undertaking of direct judicial review of Court judgments.

Furthermore, Section 305 is reasonably to be interpreted as clear legislative reassurance that the general language appearing in *Stoddard*, supra,—purporting to delineate the "special remedy by statute" of an "appeal" (under then R.S.1930, Chapter 62, Section 63, now 35 M.R.S.A. § 303) as "exclusive"—lacks the force of law, at least in any situation in which *constitutional infirmities* are being asserted as to "any" ruling or order, "final" or otherwise, of the Public Utilities Commission.

■ Such objectives, reasonably attributable to the Legislature in its original enactment in 1953 of the substance of what is presently the first paragraph of Section 305, may be taken to have been corroborated in 1961 when, by P.L.1961, Chapter 300, the Legislature introduced the present second paragraph of Section 305 authorizing, inter alia, the Law Court, in relation to *constitutional* issues, to "order such additional evidence as it deems necessary for the determination of such issues." The Legislature thus afforded to the Law Court the fullest opportunity adequately to discharge a responsibility, reasonably interpretable as constitutionally imposed, of evaluating and deciding alleged constitutional infirmities in administrative action by an independent judicial judgment as to facts (as well as law), unhampered by inadequacies which the Court might find to exist in the record of the proceedings as made before the Commission.[12]

---

11. There might well be doubt that intimations in Auburn Water District v. Public Utilities Commission, 156 Me. 222, 163 A.2d 743 (1960) and Calais v. Calais Water & Power Co., 157 Me. 467, 174 A.2d 36 (1961), bearing upon this issue, are correct. The appropriate resolution of the question must await a future case in which it is squarely raised for decision.

12. We reject the contention of the Independents (and the Commission) that in Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951)

By such action in 1961, in short, the Legislature may reasonably be said to have focused further upon, and to have highlighted, the potential inadequacy of the statutory remedy by "appeal" under Section 303 for the decision of "constitutional" issues as raised by "any ruling or order" of the Public Utilities Commission —thereby (1) confirming the need that *any* ruling or order raising constitutional questions be subject to collateral judicial scrutiny in equity, and revealing the designation of the Law Court as the judicial instrumentality to accomplish satisfaction of the need and (2) reinforcing the ability of the Law Court adequately to discharge its newly conferred responsibility by being empowered to order the taking of additional evidence (before the Commission) where necessary.

■ The foregoing analysis thus reveals with abundant clarity that historical antecedents, as well as the literal language of the statute, establish that Section 305 confers upon the Law Court a jurisdiction, sounding in equity,—with explicit authority conferred upon the Law Court "to enjoin or stay"—to decide the *constitutionality* of *any* ruling or order of the Public Utilities Commission regardless of whether the order might have been forthcoming before the completion of the administrative tribunal's processes or had achieved a status which could be deemed "final" (whether in the conventional sense connoted by any statute, generally, authorizing "appeals" from "final judgments" of a Court or, specifically, the statute (35 M.R.S.A. § 303) authorizing an "appeal" from a "final" decision of the Public Utilities Commission itself).[13]

the Supreme Court of the United States definitively establishd that no federal constitutional problem would arise were a statute to require that a Court be confined to the record made before the Commission, notwithstanding that the Court might believe that, because of inadequacies in such record, the Court was precluded from an adequate independent judgment upon the facts material to its decision of constitutional issues.

The statement in Alabama Public Service Commission v. Southern Railway Company, supra, that the Constitution does not require "relitigation" of factual issues was, it seems plain to us, a reference only to the absence of a federal constitutional mandate of a *plenary de novo* evidentiary judicial hearing—as becomes particularly clear by the Court's discussion (in footnote 11 at p. 349, 71 S.Ct. 762) of the problem which appeared in the case of Bacon v. Rutland Railroad Co., 232 U.S. 134, 34 S.Ct. 283, 58 L.Ed. 538 (1914).

See also: Central Maine Power Company v. Public Utilities Commission, et al., 156 Me. 295, 163 A.2d 762 (1960) in which this Court had itself recognized that the constitutional obligation to provide *independent* judicial judgment as to the facts material to the decision of the constitutionality of the action of an administrative body (specifically the Public Utilities Commission) had been "reduced and abridged" (p. 299, 163 A.2d 762) to the extent that no plenary de novo

evidentiary judicial hearing was constitutionally requisite and that, so far as possible, the reviewing Court should " . . . exercise the prescribed 'independent judgment' as to the facts . . . 'informed and aided' by findings of the Public Utilities Commission." (P. 304, 163 A.2d p. 768)

A decision that no constitutional issue arises when a State fails to require a *plenary de novo* evidentiary hearing as the basis for a requisite independent judicial judgment as to the facts material to the decision of constitutional issues falls far short of settling that it would likewise be constitutional for a State to deprive a Court, charged with the constitutional obligation of making an independent evaluation and judgment of the facts material to the decision of constitutional issues, of opportunity to have the record as made before the Commission supplemented by the taking of additional evidence should the Court believe such record inadequate to allow its own adequate independent judgment of "constitutional facts."

This is the point cogently made by the Opinion of the Justices, 328 Mass. 679, 106 N.E.2d 259 (1952). We agree with it.

13. It might be arguable, in the light of the above analysis, that insofar as such equity jurisdiction under Section 305 is reposed in the *Law Court* to evaluate any *constitutional* issue arising from *any* ruling or order of the Public Utilities Commission,

We conclude, therefore, that the Independents (and the Commission) are wrong in their contention that the present Section 305 proceeding, notwithstanding that it claims the Commission's Order of May 24, 1972 to be invalid as unconstitutional, should be dismissed because it seeks to initiate judicial scrutiny of a Commission order which is not yet "final." We decide that such showing of "finality" is immaterial to the availability of the Law Court jurisdiction, sounding in equity, as conferred by Section 305 for the decision of the issues of constitutionality herein being raised by New England.

■ Although, the "finality" which might be requisite for "appeal" (as a direct judicial review, generally, of Court judgments or as a special direct judicial review by "appeal", under 35 M.R.S.A. § 303, of "final decisions" of the Public Utilities Commission) is thus not a precondition of the Law Court's jurisdiction under Section 305, it fails to follow that the interposition of the Law Court may be invoked, through the mechanism of a claim of constitutional infirmity, under Section 305 in relation to *any action* of the Public Utilities Commission or at *any stage* of its proceedings.

There has developed, separate from the "finality" principle applicable in the conventional "appeal" situations, an independent principle which controls the appropiateness of collateral judicial intervention in

the activities of administrative bodies,—a principle predicated on whether the action of the administrative tribunal has achieved the stage at which it might be thought *"ripe"* for judicial consideration and action.[14]

The ripeness requirement, as analyzed by Professor Louis L. Jaffe in an excellent and comprehensive Chapter on "Ripeness and Reviewable Orders" (Chapter 10 at pp. 395, et seq.), as contained in his Treatise, "Judicial Control of Administrative Action"—(See also: "Ripeness and Reviewable Orders in Administrative Law", Jaffe, 61 Mich.L.R. 1273)—is described:

(1)

". . . as . . . not so much a definable doctrine as a compendious *portmanteau*, a group of related doctrines arising in diverse but analogically similar situations. In its most general sense ripeness is a requirement not of the administrative action to be reviewed but of the judicial controversy between the plaintiff and the agency" (Id. p. 395)

and (2) in terms of the approach of equity (the approach which explicitly underlies Section 305) as involving the proposition that

"Judgment should be keyed to the relative value of early and later review as determined by practical considerations of judicial competence, administrative efficiency and party need." (Id. p. 411)

whether "final" or otherwise,—it should be held exclusive and as superseding the equity jurisdiction of the Superior Court for the same purposes.

This argument could be buttressed by assertion of the need, previously discussed, to avoid undesirable wholesale interference with the administrative processes of the Public Utilities Commission through the raising of ingenious constitutional issues to justify invocation of the collateral intervention of individual judges endowed with equity powers. There might well be cogency to a contention that precisely to prevent such roving commissions the Legislature wisely chose to narrow the potential for intervention and to ensure that it not be undertaken too lightly—by conferring the equity jurisdiction as to constitu-

tional issues relating to Public Utilities Commission activities exclusively upon the Law Court.

This issue is not presently before us. Decision of it must await a case in which it is squarely raised. Our mention of the question is neither an expression, nor intimation, of opinion as to a correct disposition.

14. The "ripeness" doctrine is theoretically distinct from the considerations of "appeal" "finality." The failure to recognize the differences tends to induce assessment of the meaning, and measurement of the scope, of one principle by the other, and can only lead to an erroneous attenuation of both principles with consequent serious confusions in practice.

We hold that, within the foregoing general contours indicated by Professor Jaffe and as subject to further development on a case by case basis to meet individualized combinations of circumstances, there is operative, in relation to the jurisdiction reposed in the Law Court under Section 305, a principle of "ripeness" by which the Law Court may control the appropriateness of its judicial intervention into proceedings before the Public Utilities Commission; and this principle of "ripeness" functions not to prescribe a lack of jurisdiction in the Law Court but as a guide, deriving from judicial self-restraint, to the Law Court's *exercise* of a jurisdiction avowedly existing under Section 305.

We interpret the Independents (and the Commission), by their claim of "prematurity" in the present Section 305 proceeding, to be making the additional contention that the actions of the Public Utilities Commission, as here involved and attacked for constititional infirmities, are not yet in a posture "ripe" for judicial consideration and determination by the Law Court—even though it be recognized that 35 M.R.S.A. § 305 permits Law Court review of a "ruling or order" of the Public Utilities Commission not yet "final."

■ We conclude that, in the present circumstances, the contention of "prematurity", as constituted by an alleged lack of "ripeness", is without merit.

The Commission action here sought to be subjected to judicial scrutiny is patently an "order" not only in form but also in its extensive substance (Cf. United States v. Los Angeles & Salt Lake Railroad Company, 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927)), as clearly appears from our prior summary of its content; and it is an "order" which commands New England (as well as the Independents) to take specific action within prescribed time limits immediately operative.

Further, the action required of New England—that it undertake traffic measurements and cost studies and computations thereby to develop the data to be provided the Commission as a basis for the further implementation of the Commission's announced plan—imposes upon New England an immediate financial burden sufficiently large to justify the conclusion that if, as New England contends, it results from unconstitutional action by the Commission, considerations of equity require that it be prevented.

Finally, the Commission's Order of May 24, 1972 reveals an avowed commitment by the Commission to effectuate its own plan in accordance with controlling principles, formulas and computations meticulously prescribed in the Order.

Thus, the "Order" is not merely an abstract, tentative declaration by the Commission; it is a concrete, firm disposition of rights and obligations of the parties affected by the Commission's plan in form and substance sufficiently definitive to be suited to a judicial evaluation and determination of the constitutional issues it precipitates.[15]

15. New England has maintained that constitutional issues arise, inter alia, because the Commission's plan is based on a general principle of cutting across the bounds defining separate legal corporate entities to impose a responsibility of equitable and non-discriminatory treatment of telephone customers extending not only to the customers of one corporate entity but to customers of all telecommunications of corporate entities within the State of Maine.

New England maintains that such principle, and its implementation, produce a confiscation of the property of New England, its rate payers and stockholders, in violation of constitutional due process, insofar as, in New England's language, "the rate payers and stockholders of . . . New England . . . are being compelled to subsidize, for the benefit of independent rate payers and stockholders, the cost of EAS/ELS calling, not only on routes where one exchange is within and the other without the areas served by New England . . . but also on routes between two exchanges when both are completely outside any area served by

In such circumstances we decide that judicial scrutiny should not be postponed until such time as the Public Utilities Commission might see fit to complete its present proceedings and subject New England to the ultimate impact of a future and "further supplemental decree" in which, as the Order of May 24, 1972 states, the Commission

> "will set the effective date or dates when such payments [of the settlement amounts arrived at pursuant to the implementation of the Commission's Plan] in whole or in part shall commence."

The actions of the Commission, as embodied in the May 24, 1972 Order here being attacked for constitutional infirmity, present a subject-matter sufficiently "ripe" for evaluation and determination by the Law Court within its jurisdiction as conferred by Section 305.

### II–A(2)

■ The foregoing analysis, rejecting "prematurity" as a ground for dismissal of the Section 305 proceeding, establishes, in similar vein, the unsoundness of the contention of the Independents (and the Commission) that the Section 305 proceeding must be dismissed because New England

> ". . . by electing to appeal the Commission's decision [under Section 303] . . . has waived or barred its rights concurrently to file a Section 305 complaint."

On the hypothesis, arguendo, that the Commission's Order of May 24, 1972 might have "finality" sufficient to allow the Section 303 "appeal" to lie (a proposition

which, as will appear, we find it unnecessary presently to decide, see infra p. 913),[16] the Section 303 "appeal" fails, as we have seen, to allow the Law Court to evaluate and decide constitutional issues by use of independent judicial judgment of "constitutional facts", O'Donnell, Pet'r., 147 Me. 259, 86 A.2d 389 (1952) (and cases cited therein). Yet, such expanded review by the Law Court is the dominant objective of the Section 305 "complaint" (in equity) proceeding.

· Precisely because, as to the constitutional issues raised by New England, the Section 305 "complaint" provides a latitude of judicial scrutiny broader than that of the Section 303 "appeal", New England's resort to a Section 303 "appeal" must here be held without legal impact as a "waiver" or "bar" in relation to the further right of New England concurrently to invoke the Section 305 "complaint" jurisdiction of the Law Court. Central Maine Power Company v. Public Utilities Commission, 156 Me. 295, 163 A.2d 762 (1960).

The Independents (and the Commission) maintain that the 1961 amendment adding a second paragraph to Section 305—under which the Law Court is empowered, as an incident of its review of constitutional issues, to order the taking of additional evidence before the Commission—deprives *Central Maine Power Company,* supra, of precedential validity and requires a conclusion that, since 1961, use of the "appeal" under Section 303 precludes a concurrent (or subsequent) Section 305 "complaint" proceeding.

■ We find the contention untenable. It rests on the premise that the authority of the Law Court to require additional evi-

---

. . . New England . . . and thus involve no New England . . . subscribers at all."

16. Clearly, if the Commission order were not thus "final", and the Section 303 appeal were premature, the conclusion would be a fortiori that the purported taking of the Section 303 appeal could not constitute a "waiver" of, or "bar" to,

the right concurrently to prosecute the Section 305 "complaint" proceeding. An attempt to seek a Section 303 "appeal" which fails for untimeliness could not, in sound theory or practical fairness, be regarded as a "waiver" or "bar" (in any of the usual legal senses signified by those concepts) in relation to a Section 305 proceeding which would otherwise be in order.

dence creates the potential of a record in the Section 305 "complaint" proceeding different from that in the Section 303 "appeal", with consequent dangers of inconsistency.[17] That we may hypothesize various combinations of particular concrete circumstances tending to develop the possibility of inconsistencies (or duplications) in Section 303 "appeal" and Section 305 "complaint" proceedings in the Law Court cannot validly justify a principle—to be operative with generalized, automatic and absolute effect—that the initiation of a Section 303 appeal, eo ipso, must preclude a concurrent (or subsequent) undertaking to prosecute a Section 305 complaint proceeding—particularly since the Section 303 "appeal" is more restricted in the allowable judicial scrutiny of constitutional issues than the Section 305 "complaint."

Individualized situations in which a party's actions as to a Section 303 "appeal" might present a particular factual matrix showing a true "waiver" of the Section 305 right, in the sense of an intentional relinquishment of it as a known right, or otherwise barring it under the special legal principles of "forfeiture", "election", "estoppel" or "res adjudicata", may be left to be decided as they might arise.

In the present situation, however, and even should it eventuate that the Commission's Order of May 24, 1972 is a "final" order "appealable" under Section 303, the concurrent undertaking of New England to proceed with a Section 305 "complaint" allows the Law Court a full flexibility of control over the continuing course of the two proceedings. Thus, even though there should be additional evidence ordered in the Section 305 proceeding, the Law Court, by its supervisory power over its own docket, can prevent any likelihood that the Court might be reviewing the same constitutional issues on differing records; and the Court will be able, generally, to ensure that *all* the legal issues (constitutional and otherwise) being raised are adequately decided, without duplications or inconsistencies, by appropriate allocation of the issues between the two proceedings in accordance with the authorized ranges of review, respectively, which they embrace.

That New England has undertaken a Section 303 "appeal" from the Commission's Order of May 24, 1972 does not, in the present situation, preclude New England from a concurrent resort to a Section 305 "complaint" proceeding seeking Law

17. The Independents (and the Commission) have suggested that the statutory authorization to the Law Court to order additional evidence to assist independent judgment of the facts critical to the decision of constitutional issues, as a basis for modification or amendment (rather than entire nullification) of a Public Utilities Commission ruling or order, confers a legislative power upon the Law Court, a judicial tribunal, and thus causes a violation of the Maine Constitution's prohibition against the exercise of legislative power by a judicial tribunal.

The claim is without merit.

If it be assumed that the Public Utilities Commission, in its action now under scrutiny, was discharging a legislative function, on the analogy that it acts legislatively in fixing public utility "rates", it fails to follow that when a Court modifies or amends the Commission's ruling or order to remove from it any *unconstitutional* (and, therefore, "invalid") aspects—and even if the Court utilizes evidence additional to the original record on which the Commission acted and exercises an independent judgment concerning "constitutional facts",—the Court is acting legislatively.

That such action is a judicial function was settled, in our view, as long ago as the decision in Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803)—and especially as conjoined with the further principle of "severability" which allows a Court to strike down portions of legislative action for unconstitutionality.

Under the provisions of Section 305 the judicial functioning of the Court is the more strongly highlighted since it is the Public Utilities Commission which is directed to act to take out additional evidence; and the Commission is empowered to make modified, or new, findings and orders in light of the additional evidence, before the Law Court proceeds with its Section 305 judicial scrutiny and arrives at its determinations thereunder.

Court determination of constitutional issues.

## II–B

### *The Motion for Additional Evidence in the Section 305 "Complaint" Proceeding*

We now consider the motion of New England, filed in the Section 305 proceeding, requesting the Law Court to order additional evidence asserted to be critical to the decision of the constitutional issues raised.

Our examination of the record made before the Commission confirms the contention of New England that additional evidence bearing upon the constitutionality of the substance, and the practical effects, of the plan promulgated by the Commission is necessary to allow this Court adequately to fulfill its responsibility to decide the constitutional issues by an exercise of independent judicial judgment on the facts as well as the law.

The record corroborates the assertions of New England that the Commission plan (1) is

"not a compromise between the Originating Responsibility Plan and the Independents' plan on which the Record focused"

but is, relative to each of those plans, essentially new and unique in its philosophy and its principles; and (2) was promulgated by the Commission without prior indication sufficient to enable the parties reasonable time to anticipate that it would be forthcoming—with the result that the record, as it presently exists, is

"barren of any evidence either in support of or against the Commission's Plan which can be scrutinized"

by the Law Court to allow it to exercise independent judgment as to the facts critical for the evaluation and decision of the constitutionality of the Commission's plan in its controlling principles and applications.

Moreover, there was a substantial gap in time (more than one year) from the date of the close of the evidence before the Commission (May 4, 1971) to the date of the Commission's Order of May 24, 1972, as well as a further gap of an additional four months to the time (October 1972) when the Law Court heard oral argument on the motion for the taking of additional evidence. The Law Court is thus entirely uninformed as to the potential materiality of changes or developments which, according to New England, occurred during the prolonged periods from May 4, 1971 to May 4, and October, 1972. This creates the clear need for an "updating" of the evidence to permit the Law Court to be informed, and evaluate the constitutional significance, of any factual changes or developments.

▮ We conclude, therefore, that New England's motion for additional evidence should be granted to allow the taking of further evidence in kind and scope as follows: (1) evidence bearing upon whether the Commission's "Interim Maine Plan" in practical operation would require New England, its stockholders and its rate payers to subsidize EAS/ELS service to Independent Telephone Company exchanges; (2) evidence of the costs which would result to New England and its stockholders and rate payers were the Commission's plan to be effectuated; (3) evidence relevant to an adequate understanding of whether the Commission's plan in its philosophy, principles and practical effect might be considered to go beyond the legitimate bounds of constitutional governmental regulation of a privately owned utility business;[18] and (4) evidence of any facts,

---

18. We have refrained from ordering directly and explicitly that the Commission take out evidence of the nature described in item "(c)" of New England's motion, to-

wit: "evidence of the absence of any facts upon which the Commission might base statutory jurisdiction to order  .  .  ." its plan. We have so acted because it is

changes or developments occurring subsequent to the close of the evidence before the Commission (May 4, 1971) and which may be considered relevant to the constitutional issues raised concerning the Commission's plan.

Accordingly, the Public Utilities Commission is herewith directed promptly to take out evidence, in accordance with the foregoing delineations, from New England and any other of the parties who might wish to present evidence.

After it has heard and taken such additional evidence the Commission, as it deems appropriate by reason thereof, is authorized, in accordance with Section 305, to modify its original findings, conclusions and Order, or to make new findings and conclusions and a new Order.

The Commission shall report all the additional evidence which it has taken to the Law Court promptly and in manner such that, as required by Section 305,

" . . . the proof may be brought as nearly as possible down to the date of its report thereof to the court."

If the Commission has modified its original findings of fact or made new findings

of fact, or modified its original Order, or made a new Order, it shall file with the Law Court such modified findings of fact or Order or such new findings of fact or Order, if any.

Reserved to all parties are the rights provided under Section 305 in relation to such changed, or new, findings of facts or orders, including the right to file "specification of errors" as additional matter to be considered by the Law Court during the further course of the Section 305 "complaint" proceeding.

III

*The Motion to Dismiss the Section 303 "Appeal."*

█ The third motion presently before us, the motion of the Independents (and the Commission) for dismissal of New England's "appeal" under Section 303, remains for consideration.

In our prior discussion we emphasized that in the present situation, in which both the "appeal" under Section 303 and the

not patently clear to us, at this juncture, that New England is correct in its effort to characterize action by the Commission ordering New England to make payments to the Independents in implementation of a plan beyond the Commission's "statutory jurisdiction" to promulgate as, ipso facto, an "unconstitutional taking of . . . property without due process of law."

We have, therefore, chosen to avoid requiring the acceptance of such evidence by the Commission. Rather, we have left it open for the Commission, in the first instance, to reach a judgment as to whether such evidence as New England proposes to present to show lack of "statutory jurisdiction" bears reasonably upon questions *genuinely constitutional* in nature. It is our intention that such procedure will be available under our evidentiary item "(3)", above, insofar as New England may undertake to satisfy the Commission that facts bearing upon absence of "statutory jurisdiction" are relevant to the ultimate issue of whether

the "philosophy, principles and practical effects" of the Commission's plan transcend the bounds of "constitutional regulation of a privately owned utility business."

We have used the same approach as to that portion of item "(d)" of New England's motion in which it has sought to have an order for the taking out of "evidence that the Commission's plan is unjust and unnecessary, is contrary to established principles, and has no precedent anywhere . . ." Here, too, there is serious question that such information, in and of itself, establishes, or is material to, alleged *unconstitutionality* of the Commission's plan. Under our said item "(3)" above, therefore, it will be for the Commission to make the preliminary determination that the "unjustness", "unnecessariness" and "contra-precedential" or "unprecedented" novelty of the Commission's plan bear materially upon the "constitutional regulation of a privately owned utility business."

"complaint" proceeding under Section 305 have been brought before the Law Court concurrently, the Court has opportunity fully to control the continuing course of the proceedings to avoid potential duplication or inconsistency.

We have already decided, supra, that (1) the Section 305 "complaint" proceeding is validly before us regardless of whether the Section 303 "appeal" has been properly brought (as dependent upon whether the Commission's Order of May 24, 1972 might be held to be "final" within the meaning of Section 303); and (2) as an incident of the Section 305 "complaint" proceeding, the Commission shall take out additional evidence by reason of which the Commission is empowered, as it might deem appropriate, to come forward with changed, or new, findings of fact or orders.

Such decision creates various possibilities reasonably to be projected concerning the further course of the Section 303 "appeal" proceeding. In particular, it could eventuate that (1) further action of the Commission might well have deprived the Order of May 24, 1972 of the "finality", if any, it might have had when originally issued, and (2) New England—in light of a new posture which might be assumed by the Section 303 "appeal" and the Section 305 "complaint" proceeding after the Commission has completed the taking of additional evidence—will find it unnecessary to press the Section 303 "appeal."

In addition to these not unlikely eventualities there seems need, in any event, that the "appeal" should presently be held in abeyance and should remain pending on the Law Court's docket to await the completion of the taking of new evidence in the Section 305 "complaint" proceeding. This is plainly necessary to avoid (a) potential duplication of effort, (b) possibilities of variations in the contents of records and (c) incompleteness in the judicial evaluation of constitutional issues (as raised in the Section 303 "appeal") because of the limitations upon the scope of the "appeal" to deal with "constitutional facts."

Hence, we conclude that it is presently unnecessary and inappropriate that we decide whether the Commission's Order of May 24, 1972 is a "final decision", within the meaning of Section 303, qualifying it as subject to the "appeal" therein prescribed; and whether if the "Order" is not thus "final", the motion of the Independents (and the Commission) to dismiss the Section 303 "appeal" should be granted.

In the exercise of our supervisory power to control our own docket, we, therefore, retain the motion on the docket of the Law Court as pending, without decision, and continued until further Order of Court.

1—The entries (for the docket of the Law Court) are:

(a) The motion to dismiss the 35 M.R. S.A. § 305 "complaint" proceeding is denied;

(b) the motion in the 35 M.R.S.A. § 305 "complaint" proceeding for the taking of additional evidence is granted; and the additional evidence is to be taken out by the Commission in manner and scope, and with rights reserved to the Commission and all parties, as set forth in the opinion herein; and

(c) the motion to dismiss the 35 M.R.S. A. § 303 appeal is continued until further order of court.

2—The Commission is directed to act promptly pursuant to the opinion herein.

So ordered.

WEBBER, J., sat at oral argument, but did not participate in the decision.