MECHANIC FALLS WATER COMPANY

v.

PUBLIC UTILITIES COMMISSION.

CARIBOU WATER WORKS
CORPORATION

v.

PUBLIC UTILITIES COMMISSION.

ELLSWORTH WATER COMPANY

v.

PUBLIC UTILITIES COMMISSION.

WASHBURN WATER COMPANY

v.

PUBLIC UTILITIES COMMISSION.

FORT KENT WATER COMPANY

v.

PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Dec. 23, 1977.

Verrill & Dana by Roger A. Putnam (orally), Robert A. Moore, John R. McKernan, Jr., Portland, for plaintiffs.

Thomas R. Gibbon (orally), Horace S. Libby, Frederick S. Samp, Public Utilities Comn., Augusta, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, DELAHANTY and GODFREY, JJ.

DELAHANTY, Justice.

Mechanic Falls Water Company (Mechanic Falls), Caribou Water Works Corporation (Caribou), Ellsworth Water Company (Ellsworth), Washburn Water Company (Washburn), and Fort Kent Water Company (Fort Kent) have appealed from decisions rendered by the Public Utilities Commission (Commission) in their respective utility rate cases.[1] Each company seeks review under 35 M.R.S.A. § 303 (§ 303)[2] and 35 M.R.S.A.

---

1. Although separate briefs and records were filed in each rate case, Mechanic Falls, Caribou, Ellsworth, and Washburn were consolidated for oral argument. After oral argument, the Law Court granted a joint motion by Fort Kent and the Commission to waive oral argument and submit the case on the briefs.

2. As here pertinent, § 303 states:

 An appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action.

§ 305 (§ 305).[3] Except for the disallowance by the Commission of Ellsworth's standpipe painting expense, we affirm the Commission's decision in each of the above-mentioned rate cases.

Each of the appellant water companies (the Companies) is a wholly owned subsidiary of General Waterworks Corporation (General), which in turn is wholly owned by I.U. International Corporation (I.U.). Between April and September of 1975, each of the Companies filed both a schedule of proposed rates and a petition against itself alleging unreasonable, unjust, inadequate, and unjustly discriminatory rates, tolls, and charges. In each case, the proceedings connected with the proposed rates and the petition were consolidated into one action pursuant to M.R.Civ.P. 42(a),[4] which is incorporated by reference into Rule 4.8[5] of the Rules of Practice and Procedure Before the Public Utilities Commission of Maine (Commission Rule 4.8). Pending a final determination, the Commission suspended the proposed rates of each company as permitted under 35 M.R.S.A. § 69 (§ 69) for an initial three-month period and then for an additional five months.

Because of the common corporate structure, many of the issues that would have to be determined in order to establish just and reasonable rates for one utility involved questions of fact and law shared by the Companies. In order to reduce the cost and delay that would be incurred were there to be a separate proceeding for each utility, the Commission ordered that the cases be consolidated for a common hearing and decision on certain consolidated issues.[6] Consolidated hearings were held in the latter part of 1975 and continued into January of 1976. On January 26, 1976, the Commission issued its Consolidated Decree which contained general findings of fact and conclusions of law applicable to the Companies. In addition, the Commission held separate hearings in each of the rate cases on the non-consolidated questions. The Commission issued separate decrees, as more fully elaborated below, on these issues and incorporated and applied the decision in the Consolidated Decree to the financial requirements of each utility.

## A. Procedural Questions

### I. Timeliness of the § 303 Appeals

The Commission argues that the § 303 appeals of Mechanic Falls, Ellsworth, and Fort Kent should be dismissed for failure to file a timely notice of appeal in each case.

In the Mechanic Falls rate case, the Commission issued an initial decree on January 21, 1976, following an eight-month suspension period, in which it disallowed the company's proposed rates as filed and authorized Mechanic Falls to file a new schedule of rates, tolls, and charges designed to generate $65,864 of water revenues annually. The following day, this decree was rescind-

---

3. Section 305 provides in pertinent part:

 Notwithstanding sections 303 and 304, in all cases in which the justness or reasonableness of a rate, toll or charge by any public utility or the constitutionality of any ruling or order of the commission is in issue, the law court shall have jurisdiction upon a complaint to review, modify, amend or annul any ruling or order of the commission, but only to the extent of the unlawfulness of such ruling or order.

4. M.R.Civ.P. 42(a) provides:

 When actions involving a common question of law or fact are pending before the court, in the same county or a different county, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

5. Commission Rule 4.8 states:

 In all actions and proceedings, the practices and rules of evidence shall be the same as in civil actions in the Superior Courts of this state, except as otherwise provided by statute.

6. The "consolidated issues" included the determination of the fair rate of return, the federal income tax rate, the management and service contract expenses, the propriety of normalization of depreciation for tax purposes, and the propriety of depreciation on contributed property. An additional consolidated issue involved the propriety of the approval of certain contracts. However, this issue was not raised in either the § 303 appeals or the § 305 complaints, and we therefore decline to consider it.

ed, and Supplemental Order No. 1 was issued changing the revenue limit to $68,684 annually.

On January 26, 1976, the Commission issued its Consolidated Decree.

On February 5, 1976, Supplemental Order No. 1 was rescinded and replaced by Supplemental Order No. 2. Incorporating the findings of the Consolidated Decree, the Commission authorized Mechanic Falls to file a substituted rate schedule which would produce $72,109 annually.

On February 12, 1976, the Companies filed with the Commission a "Petition for Reconsideration, Rehearing and Reopening of Decision Regarding Consolidated Issues" (Petition for Reconsideration). This petition sought to reopen the record on the ground that the Commission staff had, in violation of the Companies' due process rights, participated in the rendering of the Consolidated Decree.

On February 26, 1976, the Commission issued Supplemental Decree No. 3 approving the revised rates filed on February 9, 1976 and ordering these rates to become effective January 29, 1976.

On March 3, 1976, the Commission issued its order denying the Petition for Reconsideration (Order of Denial). Certain factual findings which had been requested by the Companies were incorporated in the Order of Denial.

On April 1, 1976, the Commission received from Mechanic Falls a notice of appeal from six different Commission decrees: the initial decree of January 21, 1976, Supplemental Order No. 1, the Consolidated Decree, Supplemental Order No. 2, Supplemental Decree No. 3, and the Order of Denial. Also on April 1, 1976, the Commission received a complaint filed by the company pursuant to § 305 alleging, *inter alia*, constitutionally impermissible confiscation of the company's property.

In the Ellsworth rate case, the Commission issued an initial decree on February 27, 1976 setting Ellsworth's revenue limit. Using figures from the Consolidated Decree, the Commission disallowed the proposed rates as filed and authorized Ellsworth to file a new schedule of rates designed to generate $182,623 of water revenues annually.

Pursuant to this decree, Ellsworth filed a revised schedule of rates on March 8, 1976. In its Supplemental Decree No. 1, issued March 11, 1976, the Commission approved these rates.

On April 1, 1976, the Commission received Ellsworth's notice of appeal from the Consolidated Decree, the February 27, 1976 initial decree, the Order of Denial, and Supplemental Decree No. 1. On April 2, 1976, Ellsworth filed a § 305 complaint alleging that the various actions of the Commission had resulted in deprivation of its constitutional rights.

In the Fort Kent rate case, the Commission issued a decree dated April 26, 1976 in which it disapproved Fort Kent's proposed rates and ordered that the old rates were just and reasonable and should remain in effect. The Commission subsequently granted Fort Kent's motion of May 14, 1976 to reconsider the April 26 decree. After further hearing, the Commission on April 6, 1977 found the company's allegations in the motion to be without merit and reaffirmed the reasonableness of the April 26, 1976 decree.

On May 6, 1977, Fort Kent filed a notice of appeal under § 303 from the Consolidated Decree, the Order of Denial, the April 26, 1976 Commission decree, and the April 6, 1977 Order on Reconsideration. On the same day, it filed its § 305 complaint.

The Commission alleges that all three utilities failed to file timely appeals. As to Mechanic Falls, the Commission alleges that its notice of appeal of April 1 was timely only as to the March 3 Order of Denial. However, it urges us not even to review this order because the denial of a petition for reconsideration is not a "final decision" which can be appealed.

Under 35 M.R.S.A. § 303, an appeal from a final decision of the Commission may be taken to the Law Court on questions of law in the same manner as an appeal from a

civil judgment of the Superior Court. Appeals from judgments of the Superior Court are prescribed by M.R.Civ.P. 73 which provides in pertinent part:

> The time within which an appeal may be taken shall be *30 days from the entry of the judgment appealed from* . . . . *The running of the time for appeal is terminated by a timely motion made pursuant to any of the rules hereinafter enumerated, and the full time for appeal fixed in this subdivision commences to run and is to be computed from the entry of any of the following orders made upon a timely motion under such rules:* granting or denying a motion for judgment under Rule 50(b); or making findings of fact or conclusions of law as requested under Rule 52(a); or granting or denying a motion under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; or granting or denying a motion under Rule 59 to alter or amend the judgment; or denying a motion for a new trial under Rule 59. (emphasis added).

A necessary first step in analyzing whether Mechanic Falls' appeal was timely is to determine when the "entry of judgment" occurred for a timely appeal can be made only within thirty days from a final decision unless one of the tolling provisions of Rule 73 is applicable.

A final decision is one which "fully decides and disposes of the whole cause leaving no further questions for the future consideration and judgment of the Court . . . ." *Hazzard v. Westview Golf Club, Inc.*, Me., 217 A.2d 217, 222 (1966). The final decision requirement is equally applicable to administrative decrees, *Sawin v. Town of Winslow*, Me., 253 A.2d 694, 698 (1969), and is a statutory prerequisite under § 303.

It is clear that the January 26 Consolidated Decree was not a final judgment. It decided some general questions of law and fact that were common to all of the Companies, but it did not resolve any of the rate cases in the sense of approving of a particular schedule. That it may have indicated what the Commission would do in the future with respect to Mechanic Falls' pending rates is not sufficient to transform the Consolidated Decree into a final judgment. *Public Utilities Commission v. Saco River Telegraph & Telephone Co.*, 135 Me. 68, 69, 189 A. 186, 187 (1937). Similarly, neither the January 21 initial decree, nor the January 22 Supplemental Order No. 1, nor the February 5 Supplemental Order No. 2 was a final decision. All of them contemplated future actions on the Commission's part. Since each order commanded Mechanic Falls to file new rates, each contemplated further Commission action in order to approve the refiled rates. None of these orders therefore fulfilled the *Hazzard* requirement of fully deciding and disposing of the entire cause of action. *Hazzard v. Westview Golf Club, Inc., supra* at 222.

An examination of the various decrees and orders ineluctably leads to the conclusion that the February 26 Supplemental Decree No. 3 was the final decision for in that decree the Commission approved of the substituted rates as filed by the utility. In ordering that the substituted rates be made effective, the Commission was finally disposing of the entire rate case.

The April 1 notice of appeal fell more than thirty days after the final decision of February 26. Unless, therefore, the Petition for Reconsideration tolled the appeal period until the March 3 Order of Denial, Mechanic Falls' appeal was untimely.

The Petition for Reconsideration filed on February 12 came more than ten days after the Consolidated Decree of January 26. Were the Rules of Civil Procedure controlling, the petition under the tolling provisions of M.R.Civ.P. 73 would have been untimely for a motion to alter or amend the judgment or a motion to amend findings or make additional findings must be made within ten days of judgment.[7] However, 35

---

7. In actuality, a M.R.Civ.P. 59(e) motion to amend must come within ten days of entry of judgment. A M.R.Civ.P. 52(b) motion for additional findings of fact contains a more liberal

M.R.S.A. § 308 provides that the rules of practice "shall be the same as in civil actions in the Superior Court *except as otherwise provided.*" (emphasis supplied). Pursuant to 35 M.R.S.A. § 306,[8] the Commission promulgated Rule 5.1 of the Rules of Practice and Procedure Before the Public Utilities Commission of Maine (Commission Rule 5.1) which provides:

> Applications for rehearing to change, modify or vacate a decision or order of the Commission shall be by petition, . . and such application must be made within 20 days after service of any determination or order . . . .
>
> Parties may apply to the Commission to reopen a proceeding for the purpose of rescinding, amending, or altering an order or determination in the same manner as prescribed in the preceding paragraph. Any application for rehearing or reopening not granted within 20 days from date of filing shall be deemed to be denied.

▮　The Petition for Reconsideration, brought within twenty days after the Consolidated Decree, was therefore timely.

▮　Moreover, it is clear that the Companies' motion was a "genuine" Commission Rule 5.1 petition. The petition requested that the Commission should reopen, reconsider, rehear, and make further findings of fact concerning the Consolidated Decree because of certain alleged due process violations in the Commission's preparation and issuance of the decree. It is evident that this petition falls within the broad reach of the Rule's application for *rehearing to change, modify, or vacate* or a *reopening to rescind, amend, or alter* a Commission order.

▮　Having found that the Petition for Reconsideration was both genuine and timely, we next face the question of whether Commission Rule 5.1 has any power to toll a Commission order. Commission Rule 5.1 has no explicit tolling provision as does M.R.Civ.P. 73(a). Nevertheless, were we to review a Commission order prior to a decision on a petition to reconsider, we risk reviewing the Commission's order twice, the initial order prior to rehearing and a possible amended order following a rehearing. Our strong policy against piecemeal appellate review, *In re Spring Valley Development*, Me., 300 A.2d 736, 754 (1973), dictates that an appellant be permitted to wait until after a final determination on a motion for reconsideration in order to file his notice of appeal.

▮　Our decision that a timely petition to reconsider an administrative order terminates the running of time for an appeal is entirely consistent with federal case law. In the leading case of *Outland v. Civil Aeronautics Board*, 109 U.S.App.D.C. 90, 284 F.2d 224 (1960), Judge Burger, now Chief Justice of the United States Supreme Court, addressed the issue of whether a statute which permits a motion for rehearing from an administrative order tolls the time for appeal notwithstanding an absence of a specific provision permitting such a tolling. Speaking for the court, he stated:

> Section 1009(c) [of the Administrative Procedure Act] does not command a motion for rehearing in order to reach finality by exhaustion of administrative remedies; it leaves that to each litigant's choice. But when the party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary. Practical considerations, therefore, dictate that when a peti-

---

time provision than § 59(e) because the time period does not commence until a party or his counsel receives actual notice of the findings. *See* 2 R. Field, V. McKusick & L. Wroth, Maine Civil Practice § 59.4a (2d ed. 1970). This distinction is unimportant in this case because Mechanic Falls' Petition for Reconsideration was untimely under either section.

8.　Section 306 of 35 M.R.S.A. states:

> The commission may at any time upon notice to the public utility, and after opportunity to be heard as provided in section 293, rescind, alter or amend any order fixing any rate or rates, tolls, charges or schedules or any other order made by the commission, and certified copies of the same shall be served and take effect as provided for original orders.

tion for rehearing is filed, review may properly be deferred until this has been acted upon. *Id.* at 93–94, 284 F.2d at 227–28.[9]

We think this reasoning sound and hold that when a party in an administrative proceeding, pursuant to statutory authorization, timely petitions for reconsideration of an administrative order, the time for appeal does not begin to run until the motion for reconsideration is acted upon by the appropriate agency.

 The Petition for Reconsideration filed February 12 delayed the time for appeal until the Order of Denial on March 3.[10] The notice of appeal filed on April 1 was therefore timely unless the final decision of February 26 impliedly denied the Petition for Reconsideration.[11]

 Assuming that a final decision could impliedly deny an interlocutory petition for reconsideration, it is evident that the Supplemental Decree No. 3 did not have that effect. Of course, insofar as the Commission was incorporating its Consolidated Decree into the final decision, it was affirming that decree. However, the utilities were collaterally attacking the decree because of certain due process violations that had allegedly occurred in its preparation. It is clear, therefore, that the Commission's Supplemental Decree No. 3 which incorporated the findings of fact and law of the Consolidated Decree did not impliedly deny the Companies' Petition for Reconsideration. Indeed, the Commission's own conduct belies any such possibility for they issued a subsequent Order of Denial. Since the Commission's Supplemental Decree No. 3 did not impliedly deny the Petition for Reconsideration, the time for appeal did not begin to run until March 3 and the § 303 appeal was therefore timely.[12]

Fort Kent also filed a timely § 303 appeal. Its May 6, 1977 notice of appeal was

---

**9.** The Supreme Court cited *Outland* with approval in *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 541, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547, 554 (1970); *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 326, 81 S.Ct. 1611, 1619, 6 L.Ed.2d 869, 877 (1961).

**10.** The Commission issued its Order of Denial on March 3. If the Commission had not issued such an order, the Petition for Reconsideration would shortly thereafter have been denied by operation of law for Commission Rule 5.1 provides that "[a]ny application for rehearing or reopening not granted within 20 days from date of filing shall be deemed to be denied."

**11.** The companies would have us broadly read *Outland v. Civil Aeronautics Bd., supra,* and toll the running of an appeal regardless of whether a petition for reconsideration was on an interlocutory motion rendered prior to a final decision. We decline the invitation to construe *Outland* in such a fashion for in that case the petition to reconsider followed the final decree. As such, we are forced to consider the further question, not necessary to *Outland,* of whether a final judgment will impliedly deny a petition for reconsideration.

**12.** Our view is completely consistent with the majority of federal cases that have considered the analogous question of whether the time for appeal should commence from the final decision or from the denial of a motion to amend the judgment or to make additional findings of fact filed prior to judgment. There, as here, the context in which the issue has generally surfaced is where the subsequent appeal is timely if computed from the denial of the motion but untimely with respect to the final decision. The majority position is that a motion that would toll the time for appeal if filed subsequent to the decision has the same effect if filed prior to judgment unless that judgment can be construed to impliedly deny the motion. *See Director of Revenue v. United States,* 392 F.2d 307 (10th Cir. 1968); *United States v. Pan Am. World Airways, Inc.,* 299 F.2d 74 (5th Cir. 1962), *rev'd on other grounds sub nom. Gondeck v. Pan Am. World Airways, Inc.,* 382 U.S. 25, 86 S.Ct. 153, 15 L.Ed.2d 21 (1965); *Agostino v. Ellamar Packing Co.,* 191 F.2d 576 (9th Cir. 1951); *Partridge v. Presley,* 88 U.S.App. D.C. 298, 189 F.2d 645, *cert. denied,* 342 U.S. 850, 72 S.Ct. 79, 96 L.Ed. 642 (1951). Commenting on these cases, 9 J. Moore, Federal Practice § 204.12(4), at 963–64 (2d ed. 1973) states:

> Obliging counsel to guess at the implications of the entry of judgment seems hard, especially so since a fair reading of [the federal equivalent of M.R.Civ.P. 73(a)] assures him that the making of a timely motion terminates the time for appeal until entry of an order directly in response to the motion. Here, as everywhere, counsel ought to be entitled to rely upon a fair and reasonable reading of the Rules. *If so, the mere entry of judgment ought not to have the effect of denying a pending motion of a kind enumerated in [the federal equivalent of M.R.Civ.P. 73(a)].*

within thirty days of the Commission's decision on the Petition for Reconsideration, which petition terminated the time for appeal from the final decision of April 26, 1976. Similarly, Ellsworth's § 303 appeal filed on April 1, 1976 was timely, coming within thirty days of the final decision of March 11.

## II. Timeliness of the § 305 Complaints

The Commission alleges that the three utilities failed to file timely § 305 complaints. As with § 303, there is a thirty-day period in which to file a § 305 complaint.[13] Each utility filed a § 305 complaint alleging that the rates set by the Commission were confiscatory. While there is no finality requirement under § 305 as there is under § 303, *Lewiston, Greene and Monmouth Telephone Co. v. New England Telephone and Telegraph Co.*, Me., 299 A.2d 895, 907 (1973), it is clear that the companies were focusing on the final decision of the Commission, which decision was tolled as previously explained. In addition, Mechanic Falls and Ellsworth assert in their § 305 complaints that they had been denied procedural due process in the Consolidated Decree. Their complaints, filed within thirty days of the Order of Denial, were timely. In short, we find the § 305 complaints timely as to Mechanic Falls, Ellsworth, and Fort Kent.

## B. Substantive Issues

Before delving into the substantive issues of these appeals, we wish to comment brief-

---

**13.** Section 305 states:
 Such complaint shall be filed with the clerk of the law court and a copy thereof with the secretary of the commission, both within 30 days after the date of the said ruling or order or within such further time as the court may allow . . . . .

**14.** This provision, while applicable to the Companies' appeals, has been repealed. P.L.1977, ch. 461.

**15.** The hearings are often lengthy and extensive; in this case, the record contains well over 1,000 pages of testimony and evidence.

**16.** Art. III, § 2 of the Me.Const. states:

ly on the standards of review under § 305 and § 303.

Our scope of review under § 305 states: If in such complaint it is alleged that confiscation of property or other violation of constitutional right results from such ruling or order, *the law court shall exercise its own independent judgment as to both law and facts.*[14] (emphasis supplied).

This scope of review must be placed in perspective in order to correctly understand what is meant by the Law Court exercising its own independent judgment, especially as to the factual conclusions of the Commission.

▬▬ Regulating public utilities is in the first instance the function of the Legislature, not the judiciary. *Auburn Water District v. Public Utilities Commission*, 156 Me. 222, 163 A.2d 743 (1960). In its wisdom the Legislature delegated its entire authority to regulate and control public utilities to the Public Utilities Commission. *In re Searsport Water Co. v. Public Utilities Commission*, 118 Me. 382, 108 A. 452 (1919). Pursuant to this delegation, a comprehensive statutory scheme was promulgated authorizing the Commission to investigate proposed rates and to either approve them or set new ones following formal hearings in which it received evidence and heard testimony. 35 M.R.S.A. § 291 *et seq.*[15] Were we to make independent *findings* of fact under § 305, we would not only be duplicating a Commission function, but we may well be impermissibly treading into the legislative sphere.[16]

 No person or persons, belonging to one of these departments [legislative, executive, and judicial], shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

In *Lewiston, Greene & Monmouth Tel. Co. v. New England Tel. & Tel. Co.*, Me., 299 A.2d 895, 910 n.17 (1973), we rejected a contention that that part of § 305 which authorized the Law Court to order additional evidence conferred a legislative power on the Court in violation of art. III, § 2. Our reason for rejecting this contention was that our power to order additional evidence was only to assist us in independently judging facts critical *to the decision of constitutional issues*, clearly a judicial

■ We therefore have not interpreted § 305 as permitting a factual determination de novo by the Law Court. *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 163 A.2d 762 (1960). Factual conclusions of the Commission are independently reviewed by us with a strong presumption that they are correct and with the burden upon the utilities to clearly establish confiscation. *Id.* at 305, 163 A.2d at 768–69.

■ Our scope of review on a § 303 appeal is on questions of law, and our standard is the same as it would be in reviewing questions of law on appeal from the Superior Court. We cannot re-try questions of fact already decided by the Commission. *Public Utilities Commission v. City of Lewiston Water Commissioners,* 123 Me. 389, 123 A. 177 (1924). We can only intervene when "the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution . . . ." *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 148 Me. 374, 377, 94 A.2d 801, 803 (1953).

## I. Consolidated Income Tax

The Companies file a federal income tax return on a consolidated basis with I.U.[17] Through a consolidated return, the profits and losses of approximately two hundred I.U. subsidiaries are commingled and I.U. is subject to a tax rate of 48% on the net income of the entire group. I.U. collects the money necessary to pay its federal income tax by receiving from subsidiaries with positive taxable incomes (profit companies) 48% of their taxable income. This money is sufficient to satisfy I.U.'s actual tax liability and to pay its tax loss subsidiaries 48% of their negative taxable income. Thus, by using a 48% rate, I.U. and its subsidiaries are collecting more in "income taxes" than are necessary to cover their actual tax liability. In 1974, for instance, I.U., through the above-described tax collection system, received $25,645,163.00 from its subsidiaries. Losses incurred by certain of I.U.'s subsidiaries resulted in I.U.'s actual tax liability being only $4,604,578.00. At the same time, I.U. paid over to its tax loss subsidiaries $19,269,061.00.[18]

■ A utility is permitted to recover its income tax as a legitimate cost of business. *Inhabitants of North Berwick v. North Berwick Water Co.,* 125 Me. 446, 134 A. 569 (1926). As their federal income tax expense, the Companies sought to charge their customers 48% of the Companies' taxable income. This is the percentage that would have been permitted had the Companies filed separately.[19] It is also the percentage that I.U. was charging its subsidiaries. Because the Companies did not file a separate return and since I.U.'s policy of collecting taxes at a 48% rate from its profit companies was discretionary and not required by law, the Commission refused the Companies' request. Instead, the Commission set the Companies' federal income tax expense at 28%, which rate would still permit the Companies to collect more from their customers than was necessary to pay their actual share of I.U.'s tax liability as will be later discussed in detail.

function. This is completely consistent with our belief that if we were to make *independent findings of fact* we would be unconstitutionally extending our role beyond the *judicial scrutiny* contemplated in *Lewiston* and into the legislative arena. As Professor Davis states:

If the function performed by an agency is 'administrative' or 'legislative', and if a federal court is required to do all over again what the agency has done, the system of review violates Article III of the Constitution (United States). 4 K. Davis, Administrative Law Treatise § 29.10 at 180 (1958).

The crucial distinction is between permissibly reviewing whether an order of the Commission is just and reasonable and impermissibly determining what is a fair and just rate. *State Corp. Comm'n v. Mountain States Tel. & Tel. Co.,* 58 N.M. 260, 266, 270 P.2d 685, 689 (1954).

17. The Companies, as members of the I.U. "affiliated group," file a consolidated tax return pursuant to 26 U.S.C. §§ 1501–1505 (1971).

18. The balance of the "taxes" that were collected went to pay certain tax carry-overs and non-utilized tax credits.

19. 26 U.S.C. § 11 (1971).

The Companies allege that the Commission had no jurisdiction to establish a rate lower than 48%. Their position is that the Commission lacked the power to make the Companies' tax rate depend upon the tax liability of corporations outside the Commission's jurisdiction.

Although we have not addressed this precise jurisdictional question, we considered a similar situation in *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 136 A.2d 726 (1957). In that case, Central Maine Power Company (CMP) for rate-making purposes sought to segregate its non-jurisdictional merchandising loss from its jurisdictional income. This Court found no jurisdictional impediment to the Commission's decision to offset from the utility's income the losses from its non-jurisdictional business. We stated:

> If it [Central Maine Power] chooses to run two distinct types of business—the one a public utility and regulated, and the other private and unregulated—in one corporate organization, it seems to us entirely reasonable that the income tax chargeable to the utility business for rate making purposes should be no more than the total tax on the corporation. *Id.* at 234, 136 A.2d at 731.

The Companies seek to distinguish *Central Maine Power* by emphasizing that while CMP was one corporation, in the case at bar the companies in the I.U. system have separate corporate structures. For purposes of this inquiry, we fail to see a significant operative difference between one corporation with jurisdictional and non-jurisdictional activities, and multiple corporations, some inside and some outside the Commission's jurisdiction. In both cases, the income tax expense was computed to reflect an actual tax liability. In *Central Maine Power,* the non-jurisdictional activities were

included because the losses were part of the same corporation; with the Companies, the inclusion was due to the fact that the different corporations were consolidated into one business entity for tax purposes.[20] An analysis of a subsequent United States Supreme Court decision, *Federal Power Commission v. United Gas Pipe Line Co.,* 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967), will show that *Central Maine Power* is sound law and persuasive authority on the present issue.

In *Federal Power Commission v. United Gas Pipe Line Co., supra,* United Gas Pipe Line Company (United), which was subject to Federal Power Commission (FPC) jurisdiction, filed a consolidated return with affiliated members not subject to the FPC's jurisdiction. The FPC used non-jurisdictional losses to reduce the federal income tax rate of United. The Supreme Court found that the FPC had jurisdiction to consider non-jurisdictional income in setting United's rate. The Court stated:

> In our view what the Commission did here did not exceed the powers granted to it by Congress. One of its statutory duties is to determine just and reasonable rates which will be sufficient to permit the company to recover its costs of service and a reasonable return on its investment. Cost of service is therefore a major focus of inquiry. Normally included as a cost of service is a proper allowance for taxes, including federal income taxes. The determination of this allowance, as a general proposition, is obviously within the jurisdiction of the Commission. Ratemaking is, of course, subject to the rule that the income and expense of unregulated and regulated activities should be segregated. But there is no suggestion in these cases that in arriving at the

---

20. The Companies stress that in a consolidated tax return each subsidiary is still treated as a separate corporation. Nevertheless, the separate taxable incomes of each corporation are combined, and capital gains and losses, charitable contributions, and other transactions are computed on a consolidated basis. Thus, in effect, the affiliated group is regarded as one business entity for tax purposes. *See Fed.*

*Power Comm'n v. United Gas Pipe Line Co.,* 386 U.S. 237, 248 n. 2, 87 S.Ct. 1003, 1009 n. 2, 18 L.Ed.2d 18, 27 n. 2 (1967), quoting from a United States Senate Report: "The permission to file consolidated returns by affiliated corporations merely recognizes the *business entity* as distinguished from the legal corporate entity of the business enterprise." (emphasis supplied).

net taxable income of United the Commission violated this rule. Nor did it in our view in determining the tax allowance.

. . . . .

We think that in the proper circumstances the Commission has the power to reduce cost of service, and hence rates, based on the application of nonjurisdictional losses to jurisdictional income. *Id.* at 243, 245, 87 S.Ct. at 1007–08, 18 L.Ed.2d at 23–25.

But for the FPC formula used in setting United's tax rate, which was not considered jurisdictional, *Id.* at 245, 87 S.Ct. at 1008, 18 L.Ed.2d at 25, *United Gas* is virtually indistinguishable from the case at bar.

The Companies, in effect, urge this Court to adopt the view of the dissent in *United Gas* which asserted that the FPC was without power to consider non-jurisdictional losses in setting rates for a utility subject to FPC jurisdiction. The appellants allege that since it would be improper for the Commission to use the value of a utility's property outside of Maine in setting the rates of a Maine utility, it is also improper for the Commission to consider gains and losses of corporations outside Maine in establishing the income tax expense of a utility subject to the Commission's jurisdiction. We disagree.

▇ The powers of the Public Utilities Commission are derived entirely from statute. *New England Telephone and Telegraph Co. v. Public Utilities Commission,* Me., 362 A.2d 741 (1976). The statutory scheme contemplates that the Commission's jurisdiction extends only to a utility's services within the state. *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 148 Me. 374, 380, 94 A.2d 801,

804 (1953). Under 35 M.R.S.A. § 52, the fair rate of return is a return on property used in intra-state operations.[21] We have therefore required that the

value of the property of a public utility employed by it in intrastate business must be considered, for purposes of rate making, separately and apart from that, if any, employed in interstate business . . . . *City of Calais v. Calais Water and Power Co.,* 157 Me. 467, 472, 174 A.2d 36, 38 (1961).

Were the Commission to consider the cost of a utility's property devoted to service outside the state, the rate charged to Maine customers would not be based, as it must be, on the value of the utility's property employed in intrastate business. When the Commission in this case set the Companies' federal income tax rate, it was based upon their tax liability in providing an intrastate service. That this rate could not be established without considering the gains and losses of corporations outside the state does not violate the jurisdictional requirement that the rates are to be based upon the properly incurred expenses in providing a utility service within the state. We therefore find no jurisdictional violation.

Turning to the Commission's method of computing the federal income tax rate, we find that it was grounded upon the premise that the Companies' income tax expense should in general reflect their proportionate share of I.U.'s actual tax liability. The Commission believed that the expense should neither be based upon a hypothetical cost that would have resulted had the Companies filed separately nor on I.U.'s corporate policy of collecting from its subsidiaries the statutory rate under the Internal Revenue Code.[22]

We find no reason to permit the Maine General Waterworks subsidiaries to be charged, for rate-making purposes, a tax rate which will take substantial amounts of money that will be paid neither to the federal government nor to sister companies which have foregone usable future tax benefits. *Amounts allowed for federal income taxes in rates should, to the extent permitted by law, be based upon the realistic expectation of the*

21. Section 52 of 35 M.R.S.A. states in pertinent part:
In determining reasonable and just rates, tolls and charges, the commission shall fix a reasonable value upon *all the property of any public utility used or required to be used in its service to the public within the State* and a fair return thereon. (emphasis supplied).

22. The Commission stated:

The Commission's policy is consistent with the majority of courts and commissions which have considered the consolidated income tax question or a closely related issue.[23] On this issue, the United States Supreme Court has stated:

> Rates fixed on a [hypothetical] basis would give the . . . company and its stockholders not only the fair rate of return to which they are entitled but also the full amount of an expense never in fact incurred. In such circumstances, the Commission could properly disallow the hypothetical tax expense and hold that rates based on such an unreal cost of service would not be just and reasonable. *Federal Power Commission v. United Gas Pipe Line Co., supra* at 244, 87 S.Ct. at 1007, 18 L.Ed.2d at 24.

We approve of the Commission's policy. Included in the just and reasonable rates of 35 M.R.S.A. § 51 are the properly incurred expenses of a utility in providing a service to its customers. One of the expenses is federal income tax. The Companies chose to pay their income tax on a consolidated basis. This choice resulted in a lesser total tax being paid by the consolidated group than would have been due if each member of the group had filed an individual return. The expense to be passed on to the Maine customers was therefore a proportionate share of the tax liability of the entire group. To require the customers to "reimburse" the Companies at the hypothetical 48% rate would result in a windfall to the Companies and I.U. and would conflict with

a basic rate-making principle that rates are to be set on the basis of expenses actually incurred. *Federal Power Commission v. United Gas Pipe Line Co., supra.*

■ The Commission fixed the tax rate at 28% of the Companies' taxable income. This rate was computed to permit the Companies to pay their proportionate share of the consolidated tax expense and to reimburse "actual" loss companies in the I.U. consolidated system at 48% of their negative taxable income.[24] The only adjustment the Commission made from the 48% rate requested by the Companies was the elimination of payments to "chronic" loss companies.[25] The reason the Commission permitted the losses from actual loss companies but not chronic loss companies to be used in setting the Companies' effective tax rate concerns the nature of the loss company. Actual loss companies would have been able to use their losses if they had filed separately under the carry-forward or carry-back provisions of the Internal Revenue Code. In filing a consolidated tax return, however, these losses could no longer be used by the individual companies; instead, the losses were used to lower the effective tax rate of the consolidated group. Therefore, the Commission felt that it was equitable for the Companies to reimburse actual loss companies for the use of these losses. Chronic loss companies, however, would not have been able to use their losses if they had filed separately because they generate no positive taxable income from which they

> taxes actually paid to the federal government. (emphasis supplied).

**23.** *Southwestern Bell Tel. Co. v. State Corp. Comm'n,* 192 Kan. 39, 386 P.2d 515 (1963); *Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n,* 230 Md. 395, 187 A.2d 475 (1963); *In re N. J. Power & Light Co.,* 9 N.J. 498, 89 A.2d 26 (1952); *Long Island Water Corp. v. Pub. Serv. Comm'n,* 49 A.D.2d 392, 374 N.Y.S.2d 841 (1975); *Riverton Consol. Water Co. v. Pa. Pub. Util. Comm'n,* 186 Pa.Super. 1, 140 A.2d 114 (1958); *Re Ark. La. Gas Co.,* 4 P.U.R.4th 265 (Ark.Pub.Serv.Comm'n 1974); *Re The Conn. Natural Gas Corp.,* 11 P.U.R.4th 66 (Conn.Pub. Utils.Comm'n 1975); *Re Hawkeye State Tel. Co.,* 4 P.U.R.4th 250 (Iowa State Commerce Comm'n 1974); *Pub. Serv. Comm'n v. Pac. Tel. & Tel. Co.,* 25 P.U.R.3d 18 (Wash.Pub.Serv.

Comm'n 1958); *Re W. Va. Water Co.,* 91 P.U. R.3d 98 (W.Va.Pub.Serv.Comm'n 1971).

**24.** Actual loss companies are companies that have intermittent or infrequent losses but manage to produce a positive taxable income in some years.

**25.** Chronic loss companies are holding companies whose source of revenue is tax exempt dividends. Since these companies have expenses and have little taxable income, they produce losses year after year. The companies in the I.U. system identified as chronic loss companies are I.U., I.U. North America, Inc., I.U. Investment Corporation, General, and I.U. Transportation Services, Inc.

could offset these losses. Since nothing was "given up" by these companies in entering a consolidated tax system, the Commission held that there was no need to reimburse them for the use of their losses. This distinction appears an eminently reasonable method of distributing some, but not all, of the benefits of the consolidated tax return to the ratepayer.[26] The Commission's findings were substantially supported, its reasoning was logical, and its premises were sound. We find that the Commission committed no error.

## II. Rate of Return

Two witnesses testified on an appropriate rate of return: Mr. Mulle, a General employee, for the Companies, and Dr. Shipman, Professor of Economics at Bowdoin College, for the Commission's staff. Mr. Mulle testified in support of an 8.50% cost of debt while Dr. Shipman testified that the proper cost of debt would be 8.25%. The two witnesses similarly disagreed on the cost of equity. Mr. Mulle concluded that the cost of equity should be 14.50% as compared to a 12.50–13% recommendation by Dr. Shipman. The Commission substantially agreed with both recommendations of Dr. Shipman, and in setting 10% as a fair rate of return it found 8.25% to be the cost of debt and 12.60% the cost of equity. The Companies have appealed both of these determinations in arguing that an overall 10% is a confiscatory rate of return.

A brief expedition through the thicket of utility financing will aid in setting the necessary framework for a consideration of the specific allegations of the Companies.

It is essential that a public utility's rates should provide sufficient revenue to cover the company's total costs properly incurred in furnishing the particular utility service. The costs include the operating expenses of the utility and a proper "return" on the utility's investment. This return is computed by multiplying a utility's "rate base" by its "rate of return." *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 306, 163 A.2d 762, 769 (1960). Maine statutorily provides for an original cost rate base which is the cost of the utility's property when it is first devoted to public use. 35 M.R.S.A. § 52. The rate of return is the rate that a utility is entitled to earn on its investment. It is determined by combining the capital structure of the utility with the proper cost of capital. In this case, the Commission arrived at the 10% rate of return using the following statistics:

| ITEM | CAPITAL STRUCTURE | COST RATE | WEIGHTED COST |
|------|------------------|-----------|---------------|
| DEBT | 60% | 8.25% | 4.95% |
| COMMON EQUITY | 40% | 12.60% | 5.04% |
| | | TOTAL | 9.99% |

Typically, the capital structure used for determining the fair rate of return is the capital structure of the utility seeking the rate change. In this case, however, the Companies are wholly owned by General, a Delaware corporation and holding company for approximately seventy water companies. General in turn is ultimately wholly owned by I.U. The Companies have very little debt or equity outstanding, and their capital needs are supplied by General. Since General supplies all of the Companies' needed capital, the two expert witnesses agreed, and the Commission concluded, that the capital structure of General, consisting of 60% debt and 40% equity, would be used in computing the Companies' fair rate of return.[27]

26. We are not implying that this is the only permissible method of computing an effective tax rate when a utility files a consolidated return. Indeed, a recent study shows that a plurality (nineteen plus the District of Columbia) of state commissions permit utilities a rate reflecting only their actual share of the consolidated tax paid. FPC, Federal and State Commission Jurisdiction and Regulation of Electric, Gas, and Telephone Utilities, Washington 1973,

Table 44. Because the Commission did not set the rate at this level, we intimate no view as to the propriety of this policy.

27. Neither the staff nor the Companies have appealed from the Commission's decision adopting the capital structure of General. Our discussion of the rate of return is therefore based upon an assumption the propriety of which we have not examined.

### a. Cost of Debt

Ordinarily, the cost of debt is not a complex issue because it involves merely a mechanical computation of the interest rates on a utility's various debt investments. Even if additional debt financing is imminent, the prospective cost is not difficult to estimate, at least if interest rates are not sharply fluctuating. 1 A. Priest, Principles of Public Utility Regulation: Theory and Application 208 (1969).

The disagreement between the 8.50% requested by the Companies and the 8.25% found reasonable by the Commission is not a dispute as to the interest rates on General's outstanding debt. Rather, the controversy concerns which of General's debts should be included in computing the Companies' cost of debt. The Commission's position is that once the decision was made to adopt General's capital structure, then fairness dictated that all of General's outstanding debt be considered in computing the cost of debt to the Companies. The Companies claim that it is entirely improper to consider the subsidiary debt acquired by the non-Maine water companies prior to their acquisition by General. Their position is bottomed on a claim that this money was in effect "spent" by these non-Maine companies before they became part of General. Since the money renders no benefit to the Companies, it should not be included in computing their cost of debt.

The Commission, partly at the Companies' request, used General's capital structure in determining the Companies' rate of return. Once having adopted the capital structure of General, it is axiomatic that the cost of debt would be General's cost of debt. This is precisely the position of Mr. Mulle, the Companies' witness. He testified:

> The pro-forma capital structure of a subsidiary in a rate proceeding is that of General Waterworks Corporation consolidated. *The cost of debt capital is determined by the cost of debt capital to General Waterworks Corporation.* (emphasis supplied).

The sole question that we must determine, therefore, is whether the debt of the non-Maine companies is part of the cost of debt to General.

■ Although the non-Maine companies issued their debt before these companies were purchased by General, their debt is presently carried on General's books and was used by General in determining that its debt ratio was 60%. To the extent that this debt increases the debt ratio of General, it plainly affects General's weighted cost of debt and ultimately its rate of return. Since this debt would have been included in formulating the cost of General's debt, it was proper for the Commission to include it in computing the cost of debt to the Companies.

It is true that since this money was already "spent," it could not benefit the Companies. But given that it was not their capital structure but General's that was being used, it is unimportant that the Companies could not profit by this debt. It is to be noted that the cost of debt approved by the Commission included a proposed thirty million dollar debt financing. There was no testimony as to where this money would be spent. If it should be used for out-of-state expansion, none of the money would benefit the Companies. Nevertheless, the Maine ratepayers are being charged for this debt. If it is fair to include the thirty million dollars at an approximate 10.50% rate, then it follows perforce that it is only fair and just that the non-Maine companies' six million dollar debt at the lower 4% also be considered.

### b. Cost of Capital

■ One of the methods relied upon by both experts in computing a proper cost of equity was the "comparable earnings" test which compares the return on equity in other enterprises of corresponding risks and hazards. The experts disagreed on the companies that should be compared. Mr. Mulle used a cross section of gas, electric, and water companies while Dr. Shipman used only water companies. Based upon their different "starting points" and with

various adjustments not the subject of appeal, Mr. Mulle recommended a 14.50% cost of equity while Dr. Shipman concluded that 12.50–13% would be sufficient. The Commission substantially agreed with Dr. Shipman and found that 12.60% was the proper cost of equity. The Companies disagree with this conclusion and on appeal maintain that it was legally impermissible for the Commission to rely solely upon other water companies in applying the comparable earnings test.[28]

In *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 250, 136 A.2d 726, 739 (1957), we adopted the language of the United States Supreme Court in defining the comparable earnings test. From *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 692, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1182 (1923), we quoted:

> A public utility is entitled to such rates as will permit it to earn a return on the value of property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments *in other business undertakings which are attended by corresponding risks and uncertainties* . . . . (emphasis supplied).

We also quoted a more succinct version of the *Bluefield Water Works* formulation which appeared in the later United States Supreme Court decision of *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944).

> [T]he return to the equity owner should be commensurate with returns on investments *in other enterprises having corresponding risks.* (emphasis supplied).

The Companies allege the Commission erred in failing to give due consideration to all relevant factors in setting a fair cost of equity including yields returned upon other types of investments besides water companies. We find their contention unsupported by the record.

At the hearing, the experts disputed as to what were other enterprises that had corresponding investor risks. Mr. Mulle believed that gas and electric companies had risks similar to the Companies' risks and introduced evidence supporting his position. Dr. Shipman disagreed. He stated that gas and electric companies were more speculative than water companies and therefore the investor required a greater return on his equity. After hearing an abundance of testimony on this issue, the Commission found that a comparison with other water companies, rather than gas and electric companies, would result in a more accurate reflection of the Companies' cost of equity. It is clear that the Commission considered all types of investments but found some to be more relevant than others. That the Commission eventually determined that like utilities had corresponding investor risks does not mean that if undisputed evidence were introduced showing that unlike utilities and unregulated companies had similar hazards the Commission would still fail to take this evidence into account.

The Companies make the further assertion, unsupported by case law, that the comparable earnings test mandates that the Commission use as its basis of comparison a broad cross section of regulated and unregulated companies.[29] We disagree.

Many areas of rate setting depend in large part upon the discretion and judgment of the Commission. *Central Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 261, 109 A.2d 512, 514 (1954).

---

**28.** The Companies in their brief allege that Dr. Shipman relied solely upon five electric companies in his comparable earnings test. This is factually incorrect for Dr. Shipman, with the exception of eliminating the water companies in fair value rate base states, used the same water companies as Mr. Mulle.

**29.** In making this assertion, the Companies draw our attention to *Sun City Water Co. v. Ariz. Corp. Comm'n,* 26 Ariz.App. 304, 547 P.2d 1104 (1976). We find their reliance upon *Sun City* misplaced for that intermediate court decision was subsequently vacated by the Arizona Supreme Court, 113 Ariz. 464, 556 P.2d 1126 (1976).

Particularly vexing are questions concerning a fair rate of return for which there is neither a precise formula nor a single answer. It is not surprising, therefore, to find a disagreement among distinguished commentators as to which types of enterprises have corresponding risks and uncertainties.[30] While this disagreement has been reflected in judicial decisions,[31] the underlying uncertainty as to the proper basis of comparison may explain why appellate courts have generally deferred to the initial determination of the appropriate regulatory body. In such circumstances and in an area that devolves so heavily upon the informed and expert judgment of the Commission, § 305 compels this Court to give proper deference to the Commission's decision where as here the factual record so adequately supports its judgment.

## III. Management and Service Fee

General Waterworks Management and Service Company (Service Company), a wholly owned subsidiary of General, performs certain advisory and consultative functions for all of General's subsidiaries including the Companies. The Companies allege that the principal objective of such functions, which include cost surveillance and budget reviews, is to ensure that General's subsidiaries are operated in the most efficient manner possible.[32] The Service Company is a "nonprofit" corporation covering its costs through an annual management and service fee which the subsidiaries by contract agree to pay. The Companies sought to include the full amount of the fee in their operating and maintenance expenses, which expenses would be passed on to the ratepayer. The Commission found the expense unreasonable and set the fee at approximately two thirds of the Companies' request. The Companies allege that this figure is confiscatory. We disagree.

The Commission's decision was forged from multiple findings of fact only one of which the Companies dispute. Before considering this controverted finding, we pause briefly to review the other uncontested subsidiary conclusions of the Commission, all of which are based upon undisputed testimony. These findings directly support the Commission's ultimate conclusion that the fee was unreasonable.

---

**30.** It has been argued that a utility should be compared with non-utilities for to do otherwise introduces a circularity unbroken by any independent tie. P. Garfield & W. Lovejoy, Public Utility Economics 120 (1963). However, other commentators have noted that utilities as regulated monopolies will never face the risks that are borne by companies in the unregulated sector. J. Bauer, Updating Public Utility Regulation: Assuring Fair Rates and Fair Returns 44 (1966). Professor Priest has commented:

> The term "corresponding risks" probably has caused as much scratching and shaking of the regulatory heads as any other in the Supreme Court's lexicon. How close must the correspondence be? Should comparisons be restricted to enterprises in the same utility category: electric v. electric, telephone v. telephone, water v. water? Is the half billion dollar company to be measured against a concern having no more than a million at the bottom of its balance sheet? What if the enterprise is completely *sui generis*, the Long Lines Department of A. T. & T., for example? 1 A. Priest, *supra* at 194.

**31.** *Compare S. La. Area Rate Cases v. Fed. Power Comm'n*, 428 F.2d 407, 424 (5th Cir. 1970) and *Lower Paxton Township v. Commonwealth*, 13 Pa.Cmwlth. 135, 143, 317 A.2d 917,

922 (1974), which approved of commission decisions basing a comparison upon like utilities, *with Appalachian Power Co. v. Commonwealth*, 216 Va. 617, 628, 221 S.E.2d 872, 880 (1976), which affirmed a Commission decision basing a comparison upon different utilities and unregulated companies.

**32.** Service fees, in a holding company structure, have come under severe criticism from commentators. It has been said that

> the so-called service company furnishes the means of perpetuating elaborate and extravagant holding company organization and of charging the costs to the affiliated operating company under the guise of a joint, nonprofit layout. While it may effect combined efficiencies and economies, it also duplicates much of the necessary work, does much that is not needed, often retards policy and work decisions, and imposes charges that are not warranted for local operation. J. Bauer, *supra* at 186.

While these criticisms may or may not be applicable to the Service Company, they at least indicate a need for the Commission to carefully scrutinize and, where necessary, adjust these fees.

The Commission found that the management and service fee is not charged on the basis of work performed or time spent on behalf of the Companies. Rather, the fee is primarily based upon some pro rata allocation among all of the subsidiaries, the precise formula being determined by the Service Company. Moreover, approximately one half of the income collected by the Service Company is paid over to I.U. as a service fee expense again using a method not based on time sheets or work product. Since the expenses that flow from the Companies to the Service Company and from the Service Company to I.U. are not based upon the accurate allocation of actual time or energy expended by management on the affairs of any particular corporation, the Commission found a great potential for abuse.

It also found that the contracts entered into between the Companies and the Service Company were not arms-length transactions but were agreements which the Companies were required to accept. Because the Companies were "captive" subsidiaries, the Commission concluded that the Service Company had no incentive to charge competitive fees.

The Commission also found that some of the expenses of the Service Company could not benefit the Companies, which expenses included advertising campaigns directed at General's electric utilities. In addition, there were certain charitable contributions and expenses which the Companies' witness could not explain.

The only finding that the Companies dispute was the Commission decision to adopt Dr. Shipman's methodology for determining whether the expenses charged were unreasonable. Dr. Shipman compared the management and service expenses among the various water utilities in Maine on a per-customer basis. He found that seven investor-owned independent water companies, i. e., companies not operated in a holding-company structure, averaged $6.75/customer;

eleven publicly owned water districts averaged $6.96/customer; eight Maine subsidiaries of Consumers Water Company (Consumers), a holding company similar to General, averaged $11.28/customer; and the nineteen Maine subsidiaries of General averaged $18.01/customer. Based upon these results, he recommended a fee of $10.00/customer believing that a reasonable rate would be one higher than the independents' and water districts' but lower than Consumers'. The Commission, while approving of his approach, set the fee at $11.50/customer.

The Companies allege that Dr. Shipman's methodology was erroneous because such costs are not incurred by the Service Company on a per-customer basis. However, we know of no legal requirement that the Commission accept the Companies' method of bookkeeping in setting an appropriate service fee. Cf. Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 359 F.2d 318, 336 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). Indeed, we fail to see how the Commission could fulfill its statutory duty of setting "just and reasonable rates," 35 M.R.S.A. § 51, if it did not independently evaluate the costs upon which the rates are to be set. Other commissions have adopted a per-customer approach in evaluating the reasonableness of management and service fees.[33] Our Commission, in its reasoned judgment, also adopted a per-customer approach comparing General to other water utilities in Maine. We entirely approve of this approach as a permissible method for ensuring that General's customers were charged no more than the Service Company's services were reasonably worth.

The Companies allege that even if this method is a permissible one, the Commission erred because its decision was based upon a comparison with the service fees of the independents and water districts both of whose fees are entirely non-comparable with that of the Service Company. Their

33. See Wilmington Suburban Water Co., (Del. Pub.Utils.Comm'n, Docket No. 660, Order No. 1233, Aug. 15, 1973).

position is that the Service Company's expense should be compared to that of Consumers, the other holding-company system in Maine, excluding the service expense of one of Consumers' subsidiaries, Camden & Rockland Water Co.

It appears that Dr. Shipman in recommending a $10.00/customer fee was in large measure basing his conclusion on what the average Maine water consumer would be paying as a service expense. The Commission, on the other hand, in raising the fee to $11.50/customer set a figure comparable to, and in fact higher than, that of Consumers just as the Companies desired. That the Commission did not exclude one of Consumers' subsidiaries was eminently reasonable since this artificial manipulation serves no purpose other than to raise Consumers' fee to that of the Companies' request.

■ In conclusion, we affirm both the Commission's finding that the service fee was unreasonable and the setting of an $11.50 per-customer expense.

## IV. Accelerated Depreciation (Federal)

The Commission permitted the Companies to "normalize" their accelerated depreciation on utility property acquired on or after January 1, 1970 (post-1969 property). However, on utility property acquired prior to January 1, 1970 (pre-1970 property), the Commission required the Companies to "flow through" the benefits of accelerated depreciation. On appeal, the Companies allege that the Commission's decision requiring the flow-through of accelerated depreciation on pre-1970 property was erroneous.[34]

Under federal income tax law, a utility is entitled to deduct as a cost of doing business a reasonable depreciation allowance on its qualified property. 26 U.S.C. § 167 (1971) (§ 167).[35] For *tax purposes* the Companies used accelerated depreciation, one of the permissible methods of depreciation under § 167.[36] However, for *rate-making purposes* the Companies sought permission to use straight-line depreciation or "normalization." Because accelerated depreciation results in a greater deduction than straight-line during the early years of an asset's life, the Companies would be initially collecting more from their customers than they would be paying to the federal government under their method of accelerated taxpaying and straight-line bookkeeping. The Companies have proposed that this "extra money" be placed in a deferred tax reserve account which would provide them with interest-free capital until the deferred taxes became due.

The Commission felt constrained by the 1969 amendments to § 167 and therefore permitted normalization on post-1969 property. However, on pre-1970 property it followed its long-standing policy of using accelerated depreciation for rate-making purposes thereby flowing through to the utility's customers the benefits of lower current taxes in the early years of an asset's life.

In *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 136 A.2d 726 (1957), this Court considered the issue of flow-through versus normalization and there upheld the Commission's decision requiring flow-through. We stated:

---

34. Our discussion is confined to pre-1970 property, and we intimate no opinion as to the proper treatment of depreciation on post-1969 property.

35. Section 167(a) of the Internal Revenue Code states:
> There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
> 1) of property used in the trade or business, or
> 2) of property held for the production of income.

36. Section 167(b) of the Internal Revenue Code permits two basic methods of depreciation, straight-line and accelerated. Under the straight-line method, an equal amount of depreciation allowance is claimed for each year of the asset's life. Under accelerated or liberalized depreciation, allowances are greater than straight-line during the early years of an asset's life and less than straight-line during the later years. For a given depreciable asset, the total amount written off during its useful life theoretically will be the same under either method. *See* n.39, *infra*.

The proper treatment of depreciation and taxes calls for the exercise of judgment by those trained in the field of utility regulation. There are choices to be made in the impact of both depreciation and taxes upon the present and future ratepayers. The Commission, apart from the matter of accelerated amortization, has allowed only the current income tax as a charge in rate making. It takes the position in substance that the creation of an income tax deferred reserve under the circumstances outlined would extend into the unforseeable future charges to provide for expenses which might never arise, or to meet which, when and if the need should arise, the Company could seek relief before the Commission. There is nothing unreasonable in the conclusion reached. For example, a reduction in the tax rate might substantially lessen any anticipated impact on future ratepayers. Rates do not stand forever, and corrections may be made from time to time. *Id.* at 248–49, 136 A.2d at 738–39.

The Companies, conceding that *Central Maine Power* controls the case at bar, ask us to reconsider its vitality in light of the 1969 amendments to Section 167 of the Internal Revenue Code.

■ Under the 1969 amendments, the Code differentiates between pre-1970 and post-1969 public utility property. For pre-1970 property, the Code provides that a utility may use 1) straight-line depreciation, 2) the method used prior to August of 1969 if it also employs normalization, or 3) accelerated depreciation with flow-through, but only if that method was used prior to August of 1969.[37] In interpreting the pre-1970 utility property provision, the United States Supreme Court has declared that a utility may not unilaterally switch from flow-through to normalization. Rather, if a utility is flowing through the benefits of accelerated depreciation, it must continue to do so unless the appropriate regulatory body permits a change. *Federal Power Commission v. Memphis Light, Gas and Water Division*, 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973). Responding to the lower court opinion which held that the 1969 amendments prohibited a regulatory agency from permitting a utility to switch from flow-through to normalization on its pre-1970 property, the Court stated:

> We find no trace of a suggestion that the Federal Power Commission was denied the authority to determine whether on particular facts the abandonment of flow-through by a utility . . . would be in the public interest . . . even though it might increase rates. *Id.* at 472–73, 93 S.Ct. at 1731–32, 36 L.Ed.2d at 437.

The burden was on the Companies to convince the Commission that a change from flow-through to normalization would be in the public interest. The Commission's decision reveals that they failed to carry that burden.

We need not decide whether it would have been an abuse of the Commission's discretion to prohibit a switch from flow-

---

**37.** Section 167 of the Internal Revenue Code states in part:

(*l*) Reasonable allowance in case of property of certain utilities.—

(1) Pre-1970 public utility property.—

(A) In general.—In the case of any pre-1970 public utility property, the term "reasonable allowance" as used in subsection (a) means an allowance computed under—

(i) a subsection (*l*) method [straight-line], or

(ii) the applicable 1968 method for such property.

Except as provided in subparagraph (B), clause (ii) shall apply only if the taxpayer uses a normalization method of accounting.

(B) Flow-through method of accounting in certain cases.—In the case of any pre-1970 public utility property, the taxpayer may use the applicable 1968 method for such property if—

(i) the taxpayer used a flow-through method of accounting for such property for its July 1969 accounting period, or

(ii) the first accounting period with respect to such property is after the July 1969 accounting period, and the taxpayer used a flow-through method of accounting for its July 1969 accounting period for the property on the basis of which the applicable 1968 method for the property in question is established.

through to normalization if such a showing had been made for the record reveals that the Companies fell far short of sustaining their burden.

▬▬▬ The Companies argued that normalization is consistent with generally accepted accounting principles. If this is true, it is not controlling, for while a company's accounting methods may be considered by the Commission, they cannot dictate rate-making policies. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission*, 359 F.2d 318, 336 (5th Cir. 1966). The Companies also argued that it would be discriminatory to permit the benefits of accelerated depreciation to accrue to present customers at the expense of future customers. Even assuming that future customers pay higher rates because of accelerated depreciation, the Companies were mute on the Commission's concern that flowing through the benefits of accelerated depreciation is a hedge against the possibility of a change in the tax law which would erase any benefits that may have been deferred. More importantly, the Companies

never addressed themselves to the Commission's implicit premise: normalization with its deferred tax reserve account is inconsistent with a basic rate-making principle that customers are to be charged only the utility's actual and current federal income tax liability.[38] *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra* at 327.

Having found nothing in the 1969 amendments concerning pre-1970 property which would undermine *Central Maine Power* and believing that its premises are sound,[39] we affirm the Commission's decision.

## V. Accelerated Depreciation (State)

Ellsworth, Washburn, Caribou, and Fort Kent have appealed the Commission's decision requiring the flow-through of accelerated depreciation on state income taxes.[40] Their contention is that the Commission changed its policy of permitting normalization on post-1969 qualifying property in computing their state income tax expenses without giving them adequate notice prior to the consolidated hearing that the Com-

**38.** We are not implying that the Commission could not have permitted normalization. As our decision in *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 153 Me. 228, 136 A.2d 726 (1957) made clear, the choice of flow-through or normalization rests within the sound discretion of the Commission.

**39.** Our decision in *Cent. Me. Power* was not based on the premise that there were tax savings in using accelerated depreciation. In addressing the issue of tax savings, the United States Supreme Court has found that while *in theory* the tax liability is the same using accelerated or straight-line depreciation, in *practice* there are substantial tax savings using accelerated depreciation. *Fed. Power Comm'n v. Memphis Light, Gas & Water Div., supra.* The reason for the savings is that with a growing plant investment the depreciation allowance from replacement property offsets the declining depreciation allowance on existing property. As the California Supreme Court stated:

This replacement effect means that the higher depreciation taken in early years does not have to be paid for by lower depreciation; *the tax never catches up. City of Los Angeles v. Pub. Utils. Comm'n*, 15 Cal.3d 680, 686, 125 Cal.Rptr. 779, 782, 542 P.2d 1371, 1374 (1975). (emphasis in original).

Nevertheless, on remand from the United States Supreme Court, the Court of Appeals found that there would be no tax savings with accelerated depreciation on pre-1970 property if a utility elects to normalize its post-1969 property because the tax depreciation on post-1969 property would not be available to offset declining depreciation on the older assets. *Memphis Light, Gas & Water Div. v. Fed. Power Comm'n*, 163 U.S.App.D.C. 130, 500 F.2d 798 (1974).

We have no occasion to decide whether the analysis used by the Court of Appeals in *Memphis Light* is sound because neither *Cent. Me. Power's* nor the Commission's decisions were primarily based on the notion of tax savings.

**40.** Mechanic Falls did not join in the appeal on this issue because the Commission permitted *that company to continue to normalize* its accelerated depreciation on state income taxes. Mechanic Falls was the only case in this consolidated appeal that occurred prior to *Re New England Tel. & Tel. Co.*, 13 P.U.R.4th 65 (Me. Pub.Utils.Comm'n 1976), the first case in which the Commission required the flow-through of state income taxes. The decisions in the remaining rate cases, occurring subsequent to *New England*, relied on its reasoning in requiring flow-through.

mission was contemplating such a change.[41] We find this due process argument to be without merit.

Due process safeguards extend to hearings before state administrative agencies such as the Commission where a deprivation of the utility's property is plainly in issue. *Smith v. Pennsylvania Public Utility Commission,* 192 Pa.Super. 424, 162 A.2d 80 (1960). The outer limits of the due process clause in a public utility rate proceeding we need not here decide for it undoubtedly includes notice to the utility sufficient to enable it to present evidence on any issue relevant to that proceeding. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra* at 341. Where, however, the Commission is contemplating a change in a long-standing policy which would adversely affect a utility, a general notice of a rate proceeding may not be sufficient. *New England Telephone and Telegraph Co. v. Department of Public Utilities,* Mass., 354 N.E.2d 860, 871 (1976). In such circumstances, due process may require a more particularized notice so that the utility could introduce evidence on that issue if it so desires. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra* at 341; *New England Telephone and Telegraph Co. v. Department of Public Utilities, supra* at 871.

In this case, the Commission had a long-standing policy of permitting normalization of state income taxes. However, the Companies did not receive merely a general notice of a rate hearing. They received a particularized notice of the consolidated hearings which stated:

[T]he . . . cases . . . are consolidated for the purpose of trying and resolving together the issues of the prop-

er fair rate of return, the proper federal income tax rate, the proper management and service contract expense to be used for rate-making purposes, *the propriety of normalization of depreciation for tax purposes* and the propriety of depreciation on contributed property, . . . . (emphasis supplied).

The propriety of normalization for income tax purposes was not limited in the notice to federal income taxes. When this broad language is juxtaposed to other, more specific, language in the notice such as "the proper federal income tax rate" the Companies should have been aware that the propriety of normalization could include state income taxes. That the Companies were consciously aware that normalization was in issue becomes evident from their requested findings of fact which stated:

That the Commission allow normalization of income tax expense which results from the use of liberalized depreciation for income tax purposes (both State and Federal).

Even if we were to assume, which we do not, that the Companies did not receive adequate notice that the normalization of state income taxes would be in issue, they must show substantial prejudice in order to succeed on their due process claim. *Arthur Murray Studio, Inc. v. Federal Trade Commission,* 458 F.2d 622, 624 (5th Cir. 1972). The Companies testified in support of normalization for federal income tax purposes. Since they would have used the same arguments for normalizing state income taxes, we fail to see how they were prejudiced. *Memphis Light, Gas and Water Division v. Federal Power Commission,* 163 U.S.App. D.C. 130, 138–39, 500 F.2d 798, 806–07 (1974).[42]

---

**41.** To the extent that we can construe their argument as also attacking the merits of the Commission's decision to flow through on pre-1970 property, we deny the appeal as we did in B(IV), *supra,* on the strength of *Cent. Me. Power Co. v. Pub. Utils. Comm'n, supra.*

**42.** In *Memphis Light,* the petitioner received notice of the possibility that the Federal Power Commission would permit a third company to shift from accelerated depreciation to straight-

line. Based on evidence in the hearing, the Federal Power Commission in fact permitted a shift from accelerated depreciation with flow-through to normalization. The petitioner argued that it did not receive notice that normalization was in issue. The Court of Appeals stated:

Whether the notice amounts to sufficient notice or not, we need not here decide. Even if the notice were inadequate, such lack of

## VI. Depreciation on Contributed Property

The Companies took varying amounts of depreciation on certain items of contributed property.[43] The Commission disallowed the depreciation, and we find no error in its action.

In excluding depreciation on contributed property for rate-making purposes, the Commission said:

> We see no reason to change the Commission policy of eliminating depreciation on contributed property. *Central Maine Power Company,* 8 PUR 4th 277, 291 (Me. PUC. 1975). The purpose of depreciation is to recover the original investment in property over the life of the property. The purpose of depreciation is *not* to replace property. Since the Company has invested no funds in contributed property, it is not entitled to recover the original investment through depreciation. *Princess Anne Utilities Corp. v. Virginia et al. State Corp. Comm.,* 211 Va. 620, 179 S.E.2d 714, 88 PUR 3d 519 (1971). There is no conflict with our generally accepted accounting principles or our uniform system of accounts, for those systems have never been controlling for rate-making purposes. (emphasis in original).

■ At one time, the Commission policy was to add contributed property to the utility's operating account and then permit depreciation on that account. *See Re Harrison Water Co.,* 87 P.U.R.3d 351 (Me.Pub. Utils.Comm'n 1970). However, in 1975 the Commission reversed its policy and accepted the principles set forth in the Virginia case of *Princess Anne Utilities Corp. v. Commonwealth ex rel. State Corp. Commission, supra. Re Central Maine Power Co., supra.* In so doing, it was adopting the view that the purpose of depreciation was recompen-

sation to the utility for its original investment, a view which is logical in states like Virginia and Maine which follow the "original cost" rule in determining rate base. We believe it inequitable to allow a company to recover depreciation accruals on plants in which it has made no investment. *Accord, Southwestern Bell Telephone Co. v. State Corp. Commission,* 192 Kan. 39, 386 P.2d 515 (1963); *State ex rel. Martigney Creek Sewer Co. v. Public Service Commission,* Mo., 537 S.W.2d 388 (1976); *State ex rel. Utilities Commission v. Heater Utilities, Inc.,* 288 N.C. 457, 219 S.E.2d 56 (1975).

The Commission did not abuse its discretion when, in the 1975 *Central Maine Power* case, *supra,* it chose to adopt the *Princess Anne* principles; and it certainly has committed no error here when it merely proceeded to follow its already-established policy.

## VII. Allocation of the Rate Case Costs

The Companies requested that they be permitted to recover their costs in the consolidated proceedings. The Commission substantially allowed this expense but allocated the costs among all nineteen of General's Maine subsidiaries, thirteen of which were not involved in the instant proceedings.[44] Reasoning that the consolidated proceedings would be relevant to all of General's Maine subsidiaries in their rate cases over the next two years and that any savings would be allocable to all of the subsidiaries, the Commission concluded that "[f]airness requires that the costs be so allocated as well." The Companies complain that the costs should not have been allocated to subsidiaries who were not even parties to the rate case proceedings. They further argue that a related decision to allocate the tax and management and ser-

knowledge would be significant only if the parties would have taken a *different approach* or presented *different evidence* . . . 500 F.2d at 806. (emphasis in original). The court found no due process violation because the same evidence that had been introduced in a straight-line hearing would have been introduced in a normalization hearing. A fortiori the evidence on normalization of federal income taxes is the same evidence that would have been introduced on normalization of state income taxes.

**43.** Contributed property is property a utility validly acquires by way of a voluntary donation.

**44.** The sixth company in the consolidated proceedings was Island Falls Water Company which is not a party to this appeal.

vice fees of the rate case over a five-year period was unsubstantiated and erroneous in both law and fact. We disagree.

■ As to the five-year amortization of the rate case expense, it has been noted that "[t]he five-year term has . . . been used so frequently as to have become something of a norm." 1 A. Priest, *supra* at 67. The criterion for determining the length of the amortization period is frequently based upon a reasonable estimate of the prospective average period between rate proceedings, *i. e.* the length of time during which the new rates will apply. 1 A. Priest, *supra* at 68. Here, the Companies present no evidence to support their contention that the amortization over five years of the tax and management and service fees involved in the rate case expense was unjust or unreasonable. We find such allocation to be an exercise of the sound discriminating judgment of the Commission.

■ We also find no abuse of discretion in the Commission's allocation of the expense to thirteen subsidiaries which did not actually participate in the proceedings. It is entirely logical and reasonable to assume, as did the Commission, that future rate proceedings by other General subsidiaries will be less time-consuming and costly because of this first, very complex, rate case. The allocation was reasonable and justified.

## VIII. Staff Participation

On February 12, 1976, the Companies filed a Petition for Reconsideration seeking a rehearing and reopening of the Consolidated Decree contending that they suffered a denial of their procedural due process rights when the Commission's staff attorney of record wrote the Consolidated Decree for the Commission. In its Order of Denial refusing to reopen the Consolidated Decree, the Commission stated:

> [T]his Commission decided the issues in this case before the Staff submitted any part of the decree. All drafts were reworked extensively by the Commission, and the final decree is the work of the Commission.

On appeal, the Companies reassert their due process claim and allege that the Commission abused its discretion in denying the Petition for Reconsideration. In replying, the Commission asserts that the Companies were on notice that such a practice might occur and waived their objection by not challenging such conduct prior to the issuance of the decree.

■ Rule 9.3 of the Rules of Practice and Procedure Before the Public Utilities Commission of Maine states:

> Neither § 9.1 nor § 9.2 shall prohibit the Commission from consulting persons in its employ without affording an opportunity to other parties to the proceeding to be present; *nor shall said sections prohibit persons in the Commission's employ from preparing proposed findings for any proceeding before the Commission pursuant to the Commission's direction* without forwarding a copy of such proposed findings to all other parties to the proceeding. (emphasis supplied).

Because the Companies were on notice, it was incumbent upon them to bring any objection to the Commission's practice to its attention if they wished to preserve their rights on appeal. *Hennesey v. Securities and Exchange Commission,* 285 F.2d 511, 514–15 (3rd Cir. 1961). The reason for the rule is that the agency and not the appellate court should have the first opportunity to rule on the objectionable practice. *Wilson & Co. v. United States,* 335 F.2d 788, 794 (7th Cir. 1964), *remanded on other grounds,* 382 U.S. 454, 86 S.Ct. 643, 15 L.Ed.2d 523 (1966). Although it may have been more judicious for the Companies to have raised their due process argument prior to the Consolidated Decree, a timely filing of the Petition for Reconsideration contending that the staff attorney had *in fact* written the decree sufficiently informed the agency of their objection thereby preserving the issue on appeal. *Wilson & Co. v. United States, id.*

■ We reject the Companies' position that it was error for the Commission to deny their Petition for Reconsideration. As

explained earlier, see A(I) and n.8, supra, the Commission may reopen any prior order. Reopening is not a matter of right but rests within the sound discretion of the Commission. In re General Marine Construction Corp., Me., 272 A.2d 353, 354 (1971). In its Order of Denial, the Commission essentially admitted all of the Companies' requests for findings of fact thereby leaving no factual question unresolved.[45] Its decision to deny the Companies' petition does not reflect an abuse of discretion.

■　The issue on appeal is very narrow. The question is whether a due process violation occurs if the Commission orders a staff attorney of record to prepare its decree after the Commission had already reached its decision. An abundance of case law suggests that there is no due process violation in such circumstances. Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); Marcello v. Bonds, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); American Telephone and Telegraph Co. v. Federal Communications Commission, 449 F.2d 439 (2d Cir. 1971); Wilson & Co. v. United States, supra. On the facts in this case, we agree.[46]

IX.　Effective Dates of Revised Rates

The effective dates of the revised rates are challenged by Washburn, Caribou, and Ellsworth. Because the operative principles in this issue are alike for all three companies, we will discuss the factual situation for only one utility, Washburn, and apply our conclusion to Caribou and Ellsworth.

Washburn initially filed its proposed rates with the Commission on June 20, 1975. After a summary investigation, the Commission suspended the proposed rates for a period of three months from July 20, 1975 and subsequently suspended the proposed rates for a five-month period from October 20, 1975. On March 19, prior to the expiration of the suspension period, the Commission disallowed these rates as unjust and unreasonable and ordered the company to file a new schedule of rates designed to produce $43,852.00 annually. Washburn filed the substituted rates on March 29, 1976 with a request that they be made retroactive to March 20. In its March 31, 1976 decree, the Commission denied Washburn's request for retroactive application of its substituted rate schedule and instead approved Washburn's refiled rates effective prospectively from March 31. On appeal, Washburn alleges that under 35 M.R.S.A. § 69 it was error to have given its rates prospective application from March 31. Washburn's allegation requires us to once again interpret § 69, a section that we have thrice considered in less than a year and one half. See New England Telephone and Telegraph Co. v. Public Utilities Commission, Me., 376 A.2d 448 (1977) (New England III); New England Telephone and Telegraph Co. v. Public Utilities Commission, Me., 362 A.2d 741 (1976) (New England II); and New England Telephone and Telegraph Co. v. Public Utilities Commission, Me., 354 A.2d 753 (1976) (New England I).

Section 69 provides in pertinent part: Whenever the commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission under the provisions of law, it shall have power at any time before the effective date of such change

---

45. In its Order of Denial, the Commission stated that the Companies' request to admit that a staff attorney had prepared the decree was "factually incorrect." As further qualified in the order, the Commission conceded that the decree was written by a member of the staff pursuant to its direction. Since this admission was all that the Companies were seeking, the Commission's decision not to reopen the decree was not error. Whether it would have been an abuse of discretion to refuse to reopen the decree if the Commission had in substance denied the Companies' request to admit we do not here decide although such a practice appears ill-advised since it leaves a factually unresolved record on appeal.

46. We are aware of a recent case, Providence Gas Co. v. Burman, 376 A.2d 687 (R.I.1977), holding that the Attorney General could not appear on behalf of a public utility commission's staff while at the same time advising the commission. This broader issue of the separation of functions within the Commission is not before us, and our decision leaves that question unresolved.

or changes . . . to hold a public hearing and make investigation as to the propriety of such proposed change or changes. . . .

Pending such investigation and order, the commission may at any time within said period preceding the effective date of any such schedule . . . suspend the operation of such schedule or any part thereof, but not for a longer period than 3 months from the date of said order of suspension. If said investigation cannot be concluded within said period of 3 months, said commission may in its discretion extend the time of suspension for a further period of 5 months.

There are many dates, the effect of which, the parties do not dispute. They agree that under 35 M.R.S.A. § 64 [47] Washburn's proposed rates would have become effective thirty days after being filed on June 20, 1975 had the Commission not acted. However, pursuant to its power under § 69, the Commission suspended the proposed rates "before the effective date of such change . . . to hold a public hearing and make investigation as to the propriety of such proposed change . . ." Had the Commission not again suspended the proposed rates, these rates would have become effective by operation of law at the termination of the initial three-month period. *New England II, supra* at 749. But because the investigation could not be concluded within the three-month period, the Commission extended the time of suspension for another five months. The parties agree that the Commission's subsequent March 19 order, coming within the eight-month suspension period authorized by § 69, was not ultra vires.

Washburn does allege, however, that since the substituted rate schedule was not approved until March 31, subsequent to the maximum suspension period which terminated on March 19, its proposed rates of June 20 were effective during this eleven-day hiatus. We disagree.

We explained in *New England II* that a proposed rate can be suspended only for a maximum period of eight months. If the Commission had not issued an order within this suspension period disapproving the proposed rates and authorizing the filing of substituted rates, the June 20 proposed rates would have become effective by operation of law.

> The suspension power granted by paragraph two of Section 69 allows the Commission to *delay*, but not to abolish, "the effective date" of the "proposed" changes. During this period of delay, the changes remain "proposed" and, as such, a proper subject for the investigation authorized by Section 69. *At the expiration of this period, if the proposed rates are not found unjust or unreasonable and a substituted rate is not authorized in the meantime,* the effective date, delayed but not abolished by the suspension, has arrived. *New England II, supra* at 749. (emphasis supplied in last sentence).

By issuing an order on March 19, within the suspension period, the Commission prevented the proposed rates from becoming effective. Contrary to Washburn's allegation, the March 19 order did not extend the suspension period; rather, it terminated the suspension and permanently ordered that the proposed rates never become effective.

Washburn contends in the alternative that since the suspension period ended prior to the Commission's approval of its substituted rate schedule, the substituted rate schedule should be given retroactive application to March 20, the first day following the termination of the suspension period. We again disagree.

In *New England I*, we explained that proposed or substituted rates have prospective effect from on or after the date they are filed with the Commission.

> Since changes in permanent rates become effective only by virtue of the utility's

47. Section 64 of 35 M.R.S.A. states in part:
No change shall be made in any schedule, including schedules of joint rates, except upon 30 days' notice to the commission, and

all such changes shall be plainly indicated upon existing schedules by filing new schedules in lieu thereof 30 days prior to the time the same are to take effect.

placing on file a changed schedule of rates—either, as clarified aforesaid, by the utility's own entirely unilateral filing or the utility's *"substituted"* filing in compliance with a Commission order for such substitution—all changes of a utility's permanent rates go into effect *only prospectively*, viz., *on or after* the date of either (a) the utility's own entirely unilateral filing putting the changed rate into effect, or (b) the utility's filing of such substituted rate schedule as the Commission has ordered. *New England I, supra* at 762. (emphasis in original).

Since Washburn's substituted rates were filed on March 29, they could only have had effect from on or after that date. The Commission, in approving the rates on March 31, was acting entirely within the ambit of § 69 as clarified by the *New England* trilogy.

■ Ultimately, Washburn appears to be alleging that because the maximum suspension period is eight months, the substituted rates must be in effect prior to the termination of that suspension period. The flaw in its argument is that the maximum suspension period concerns the length of time a *proposed rate schedule* can be suspended. It simply has no bearing on when a *substituted rate schedule* becomes effective. In this regard, its only relevance is to fix the maximum period of time within which the Commission can order a filing of substituted rates.[48]

Our decision, contrary to Washburn's assertion, protects a utility against inordinate administrative delay. Since a substituted rate schedule must be ordered within the

statutory period prescribed by § 69, the effective date of the new rates is primarily conditioned upon the speed with which a utility can refile its rates in conformity with the Commission decision. Washburn was free to file its substituted rates at any time after the Commission decision of March 19. That it took Washburn from March 19 until March 29 to refile its rates was financially unfortunate from Washburn's point of view; this delay was, however, attributable to Washburn and not the Commission.

We finally come to that period of time between the filing of the substituted rates on March 29 and their approval effective March 31. This two-day period was necessary so that the Commission could determine that the substituted rate schedule conformed to its March 19 order, 35 M.R.S.A. § 295,[49] and that the new schedule would yield revenues found by the Commission in its prior order to be just and reasonable.

■ In its March 31 decree, the Commission had the choice of making the substituted rates effective when refiled or when approved. *New England I, supra* at 762. Its choice of the approval date rested within the sound discretion of the Commission. We recognize that during this period there is a potential for Commission abuse for the subsequent decree approving the substituted rates depends entirely upon the alacrity of the Commission. But Washburn does not allege that the Commission unreasonably delayed its approval of the refiled rates. In acting reasonably and expeditiously in approving the refiled rates, the Commission's decision to make Washburn's rates

48. Massachusetts has a suspension statute very similar to § 69. Mass.Gen.Laws Ann. ch. 159, § 20 provides in pertinent part:

Pending any such investigation and the decision thereon, the department may . . . suspend, from time to time, the taking effect of such changes, but not for a longer period than ten months in the aggregate beyond the time when the same would otherwise take effect.

Although the issue of the effective date of a substituted rate schedule does not appear to have been litigated in Massachusetts, a recent court decision has sub silentio interpreted the Massachusetts suspension statute as we have

interpreted § 69, viz., if proposed rates are disapproved and new rates authorized while the suspension period is running, the new rates will have prospective effect from the date they are approved even if that date falls outside the suspension period. *See New England Tel. & Tel. Co. v. Dep't of Pub. Utils.*, Mass., 354 N.E.2d 860, 862–63 (1976).

49. Section 295 of 35 M.R.S.A. provides in pertinent part:

Every public utility to which such order applies shall make such changes in its schedules on file as may be necessary to make the same conform to said order.

effective on March 31 was not an abuse of its discretion. Similarly, the Commission decision to give prospective effect to the refiled rates of Caribou and Ellsworth was not improper.

## X. Disallowance of Standpipe Painting Expense

Ellsworth sought $1,625.00 per year as a pro forma operating and maintenance expense adjustment. In the data which Ellsworth submitted, there is indication that the $1,625.00 per year (or total of $13,000.00 for eight years) was sought to provide for painting of standpipes. Ellsworth has two standpipes: a 290,000–gallon standpipe which was painted once in 1970 for a cost of $5,830.00 and a 500,000–gallon standpipe which has not been painted since its erection in 1966. Ellsworth arrived at the figure of $13,000.00 by adding cost estimates of $6,200.00 for the smaller tank and $6,800.00 for the larger tank. In answer to a staff data request, it stated that the current estimated cost for painting the smaller tank is $18,000.00, which price includes sandblasting the surfaces (a procedure not done in 1970), and that the estimated cost for painting the larger tank is $24,000.00.

The Commission disallowed any adjustment at all for standpipe painting. It stated:

> We have concluded that the standpipe painting adjustment is not supported by the evidence. The Company witness testified that the standpipe painting adjustment was to recover the past cost of standpipe painting. The evidence shows that this expense was incurred some years ago and was written off completely in the past. We will not permit an expense in rates set for the future which was actually incurred and written off several years ago.

We believe that the Commission's disallowance of the adjustment was erroneous as a matter of law and inconsistent with its own policy.

It is true that the 1970 painting expense was completely written off and that no unamortized balance remains.

However, as we read the record, Ellsworth was *not* asking for the adjustment as a reimbursement for a past painting but was in fact requesting a pro forma adjustment for use in the future. This type of adjustment was allowed in the companion case of Mechanic Falls. Apparently, the only reason it was disallowed in Ellsworth was because of a statement by the rate coordinator for General who, when asked whether any amount of the sought adjustment was to be applied to future painting rather than past painting, answered in the negative. However, a close reading of the record indicates that Ellsworth's accounting practice tracks that of Mechanic Falls in amortizing costs for standpipe painting over a future period.

We find the $13,000.00 cost estimate, or $1,625.00 per year, to be reasonable, and we allow that amount as a pro forma expense for standpipe painting.

## C. Conclusion

Our analysis of these cases compels us to conclude

(1) that the section 303 appeals must be denied and the Commission's decrees and orders are affirmed except with respect to disallowance by the Commission for rate-making purposes Ellsworth's proposed standpipe adjustment in Docket No. KEN–76–15; and

(2) that the Companies have failed to sustain their burden of proving confiscation or violation of their constitutional rights in their section 305 complaints.

The entries shall be:

> KEN–76–13: Section 303 appeal denied; decrees and orders of the Public Utilities Commission affirmed.
>
> Section 305 complaint denied; judgment for the defendant Public Utilities Commission.
>
> KEN–76–14: Section 303 appeal denied; decrees and orders of the Public Utilities Commission affirmed.
>
> Section 305 complaint denied; judgment for the defendant Public Utilities Commission.

KEN–76–15: Section 303 appeal denied except with respect to disallowance by the Commission for rate-making purposes Ellsworth's proposed standpipe adjustment. Remanded to the Public Utilities Commission for adjustment consistent with section B(X) of this opinion.

Section 305 complaint denied; judgment for the defendant Public Utilities Commission.

KEN–76–16: Section 303 appeal denied; decrees and orders of the Public Utilities Commission affirmed.

Section 305 complaint denied; judgment for the defendant Public Utilities Commission.

KEN–77–21: Section 303 appeal denied; decrees and orders of the Public Utilities Commission affirmed.

Section 305 complaint denied; judgment for the defendant Public Utilities Commission.

POMEROY, WERNICK and GODFREY, JJ., and DUFRESNE, A. R. J., concurring.

ARCHIBALD, J., did not sit.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.